# EXHIBIT F

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CLIFFORD W. JONES, on behalf of herself and
all others similarly situated,

          Plaintiff,

v.

MBNA CORP., BRUCE L. HAMMONDS, and
KENNETH VECCHIONE,

          Defendants.

Civil Action No. _05 - 316_

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel, which investigation included analysis of news articles and reports, public filings, press releases and other matters of public record.

## NATURE OF THE COMPLAINT

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of MBNA Corp. ("MBNA" or the "Company") during the period January 20, 2005 through April 20, 2005 inclusive, (the "Class Period") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and the regulations promulgated thereunder by the SEC, including Rule 10b-5.

2.      As detailed below, defendants projected annual income growth of 10%. In the weeks following the projection, January 31 to February 7, MBNA insiders sold more than one million shares of their personally-held MBNA stock, including

351,409 shares sold by defendant Bruce L. Hammond on January 27, 2005 for proceeds in excess of $9 million. On April 21, 2005, defendants created what one analyst described as "shock and awe" in the market place by announcing that first-quarter income was down 93% percent year-over-year, including a one-time restructuring charge, making it highly unlikely that the Company would be able to achieve 10% annual income growth, and that, moreover, the reduced earnings included a $207 million write-down of MBNA's "interest-only strip receivable", which is a measure of anticipated credit-card interest payments that is supposed to be adjusted on an ongoing basis. On this news, shares of MBNA fell to a two-year intraday low of $18.50 before closing at $19.28, down $3.83, or 16.6%, on a day most major bank stocks rose.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

4.    Venue is proper in this district pursuant to Section 27 of the Exchange Act (28 U.S.C. § 1391(b)). Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this district. In addition, MBNA maintains its principal executive offices in this district.

5.    In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce, including the mails, telephone and the facilities of national securities exchanges.

## PARTIES

6.     Plaintiff Clifford Jones purchased shares of MBNA at an artificially inflated price during the Class Period as indicated on the attached certification and suffered damages thereby.

7.     Defendant MBNA is the parent company of MBNA America Bank, N.A. (MBNA America), a national bank which, in turn, has two wholly owned non-United States bank subsidiaries: MBNA Europe Bank Limited (MBNA Europe) and MBNA Canada Bank (MBNA Canada).  MBNA is an international financial services company providing lending, deposit, and credit insurance products and services to its customers.  Through MBNA America, the Company is an issuer of endorsed credit cards, marketed primarily to members of associations and customers of financial institutions and other organizations; it is the largest card issuer in the United States.  In addition to its credit card lending, MBNA makes other consumer loans, as well as commercial loans primarily to small businesses.  MBNA's principal place of business is 1100 North King Street, Wilmington, DE 19884.

8.     Defendant Bruce L. Hammonds was at all relevant times MBNA's President, Chief Executive Officer and a MBNA director.

9.     Defendant Kenneth A. Vecchione was at all relevant times Vice Chairman and Chief Financial Officer of MBNA and MBNA America.

10.     Defendants Hammonds and Vecchione are referred to collectively herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class")

3

consisting of all persons who purchased the publicly traded securities of MBNA between January 20, 2005 and April 20, 2005, inclusive. Excluded from the Class are the Defendants herein, members of each Individual Defendant's immediate family, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

12.     MBNA has millions of shares of common stock outstanding, and the Company's common stock was actively traded on the NYSE throughout the Class Period. Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

13.     Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

14.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with the other members of the Class Plaintiff seeks to represent.

15.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it

4

impossible for the members of the Class individually to redress the wrongs suffered. There will be no difficulty in the management of this action as a class action.

16.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether the Company's publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

c.     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

d.     whether Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

e.     whether the market prices of MBNA common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

f.     whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

17.     The Class Period begins on January 21, 2005.  On that date, MBNA filed a Form 8-K with the SEC which stated, in pertinent part, as follows:

> *MBNA Corporation announced today that management's objective is to increase earnings per share by 10% in 2005 and by an average of 12% per year over the next several years, excluding the impact of a previously announced restructuring charge of approximately $300 million to $350 million pre-tax that the Corporation will take in the first quarter of 2005.* Management believes earnings growth in 2005 will primarily be driven by improvements in credit quality and reduced expense growth rates.
>
> Management anticipates slower average loan growth in the first half of 2005 than in the second half of 2005. Management anticipates this lower growth rate in part because of the overall slower industry growth rate and the Corporation's decision to reduce its marketing of low introductory rate offers in 2004 and focus more on rewards programs. Management believes the reduction in low introductory rate marketing in 2004 will have less of an impact on loan growth in the second half of 2005 than in the first half. [Emphasis added.]

18.     On January 21, 2005, defendants held a conference call for analysts in which defendant Hammonds stated, in pertinent part, as follows:

> *We expect earnings growth to average about 12% over the next several years. There will be years when it's more than 12% and years when it's less than 12%. And in fact, in 2005 we expect it to be more like 10%. We expect it to be 10% this year primarily because we're starting the year off at a relatively low level of average growth.* [Emphasis added.]

19.     On March 15, 2005, defendants filed the Company's Form 10-K with the SEC.  With respect to interest-only strips, the Form 10-K stated, in pertinent part, as follows:

### OFF-BALANCE SHEET ASSET SECURITIZATION

The Corporation uses securitization of its loan principal receivables as one source to meet its funding needs. The Corporation accounts for its securitization transactions in accordance with Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of

6

Liabilities— a Replacement of FASB Statement No. 125" ("Statement No. 140"), issued by the Financial Accounting Standards Board ("FASB"). When the Corporation securitizes loan principal receivables, the Corporation recognizes a gain on sale and retained beneficial interests, including an interest-only strip receivable. The interest-only strip receivable represents the contractual right to receive interest and other revenue less certain costs from the trust over the estimated life of the securitized loan principal receivables.

$$* * * * * *$$

*The Corporation estimates the fair value of the interest-only strip receivable based on the present value of expected future net revenue flows.* Since quoted market prices for the interest-only strip receivable are not available, management uses certain assumptions and estimates in determining the fair value of the interest-only strip receivable. These assumptions and estimates include projections of interest income, certain fees, recoveries on charged-off securitized loans, gross credit losses on securitized loans, contractual servicing fees, and the interest rate paid to investors in a securitization transaction ("excess spread"). These projections are used to estimate the excess spread to be earned by the Corporation over the estimated life of the securitized loan principal receivables. The other assumptions and estimates used by the Corporation in estimating the fair value of the interest-only strip receivable include projected loan payment rates, which are used to determine the estimated life of the securitized loan principal receivables, and an appropriate discount rate.

*The assumptions and estimates used to estimate the fair value of the interest-only strip receivable at December 31, 2004, reflect management's judgment as to the expected excess spread to be earned and projected loan payment rates to be experienced on the securitized loans.* These estimates are likely to change in the future, as the individual components of the excess spread and projected loan payment rates are sensitive to market and economic conditions. For example, the rates paid to investors in the Corporation's securitization transactions are primarily variable rates subject to change based on changes in market interest rates. Changes in market interest rates and competitive pressures can also affect the projected interest

income on securitized loans, as the Corporation could reprice the managed loan portfolio. Credit loss projections could change in the future based on changes in the credit quality of the securitized loans, the Corporation's account management and collection practices, and general economic conditions. Projected loan payment rates could fluctuate based on general economic conditions and competition. Actual and expected changes in these assumptions may result in future estimates of the excess spread and projected loan payment rates being materially different from the estimates used in the periods covered by this report.

*On a quarterly basis, the Corporation reviews prior assumptions and estimates and compares the results to actual trust performance and other factors for the prior period that approximates the average life of the securitized loan receivables. Based on this review and the Corporation's current assumptions and estimates for future periods, the Corporation adjusts as appropriate, the assumptions and estimates used in determining the fair value of the interest-only strip receivable.* If the assumptions change, or actual results differ from projected results, the interest-only strip receivable and securitization income would be affected. If management had made different assumptions for the periods covered by this report that raised or lowered the excess spread or projected loan payment rates, the Corporation's financial condition and results of operations could have differed materially. For example, a 20% change in the excess spread assumption for all securitized loan principal receivables could have resulted in a change of approximately $259 million in the value of the total interest-only strip receivable at December 31, 2004, and a related change in securitization income. [Emphasis added.]

20.     On April 6, 2005, defendants filed a Form 8-K with the SEC in which they stated that job cuts, asset sales and contract terminations associated with a restructuring would result in $785 million of pretax costs, more than twice the amount forecast in the January 21, 2005 SEC filing.

21.     The statements set forth above in ¶¶17-19 were materially false and misleading, and defendants knew or recklessly disregarded that they were false and misleading because, among other reasons:

    a.     There was no reasonable basis for the statement, when made, that MBNA would achieve annual earnings growth of 10%;

    b.     The Company failed to disclose that increases in interest rates, which had commenced before the Class Period and continued throughout, were driving down the proper carrying value of the Company's interest-rate only strips, such that the value of the Company's reported assets was materially overstated;

    c.     The Company did not adjust as appropriate the assumptions and estimates used in determining the fair value of the interest-only strip receivable.

### "SHOCK AND AWE" IN THE MARKETPLACE

22.     The truth began to emerge on April 21, 2005 before the market opened. On that date, MBNA announced that its profit would be "significantly below" its 10% growth target for 2005 purportedly because customers were "unexpectedly" paying off credit card debt in favor of less-expensive sources of credit such as home-equity loans. The Company further announced that first-quarter earnings fell 93%, year-over-year to $0.02 a share, before a restructuring charge, from $0.40 cents a share in the first quarter of 2004, and that earnings were adversely affected by a $207 million write-down of the Company's interest-only strip receivable. Reported first-quarter earnings excluding the one-time restructuring charge were $0.40 per share; the average earnings estimate of 23 analysts surveyed by Thomson Financial had been $0.46 per share.

23.     On this news, shares of MBNA fell to a two-year intraday low of $18.50 before closing at $19.28, down $3.83, or $16.6 percent, on a day most major bank stocks rose. The lowered earnings included a $206.6 million write-down of its interest-only strips.

24.     On April 21, 2005, *Bloomberg News* published an article about the MBNA disclosure that stated, in pertinent part, as follows:

> Executives at MBNA gave 2005 profit growth forecasts in January, and didn't indicate the company would fail to reach its growth target when it updated its restructuring plans on April 6, according to Jason Tyler, who helps oversee $22 billion at Ariel Capital Management in Chicago.
>
> "Management has lost a lot of credibility," said Tyler, who firm holds 10.8 million shares. "For the first time in their history they give earnings guidance, and they can't get there. There certainly is a little egg on their face right now.

25.     Bruce Harting, an analyst for Lehman Brothers, stated in a note to investors as follows: "We find this somewhat disconcerting. The company issued the [10%] guidance just three months ago." On April 21, 2005, Susquehanna Financial Group LLP published an analyst report on MBNA under the headline, "Shock and Awe," and Friedman Billing analyst Scott Valentin stated, "While the restructuring charges and a challenging receivables growth environment was expected, the degree of margin compression, combined with the IO write-down was a negative surprise."

## MBNA'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

26.     In order to overstate the Company's financial results during the Class Period, the defendants caused the Company to misreport its investment in interest-only securities, mortgages servicing rights and adjustable-rate mortgages. Defendants

overstated MBNA's assets by failing to recognize impairment of these assets caused by adverse interest-rate increases. Defendants thereby overstated the Company's financial statements during the Class Period. As a result of MBNA's improper accounting for its portfolio, MBNA presented materially false financial results, in its Form 10-K filed on March 15, 2005, during the Class Period, in violation of GAAP despite the fact that defendants repeatedly represented that the financials were prepared in accordance with generally accepted accounting principles.

27.     These statements were false and misleading as to the financial results released during the Class Period as such financial information was not prepared in accordance with GAAP, nor did the financial information present fairly the Company's operations due to the Company's improper accounting for its interest-only investments and mortgage-servicing rights which improper accounting caused the Company's earnings to be materially overstated in violation of GAAP and SEC rules.

28.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

29.     GAAP, as forth in FASB Statement of Concepts No. 5, ¶ 87 states:

> An expense or lose is recognized if it becomes evident that
> previously recognized future economic benefits of an asset

11

have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits.

30.     GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 115, <u>Accounting for Certain Investments in Debt and Equity Securities</u>, ¶16, states:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred. If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the writedown shall be included in earnings (that is, accounted for as a realized loss).[1]

31.     Due to the aforementioned accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP.

32.     SEC Regulation S-X requires that publicly traded companies present their annual financial statements in accordance with GAAP. [17 C.F.R. § 210.4-01(a) (1)]. In addition, Regulation S-X requires that interim financial statements also comply with GAAP. Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Management is

---

[1] According to SFAS No. 125, 14:

Interest-only strips, loans, other receivables, or retained interests in securitizations that can contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all of its recorded investment shall be subsequently measured like investments in debt securities classified as available-for-sale or trading under Statement 115, as amended by this Statement (paragraph 233).

responsible for preparing financial statements that conform to GAAP. As noted by

AICPA professional standards:

> financial statements are management's responsibility . . . . [M]anagement
> is responsible for adopting sound accounting policies and for establishing
> and maintaining internal control that will, among other things, record,
> process, summarize and report transactions (as well as events and
> conditions) consistent with management's assertions embodied in the
> financial statements. The entity's transactions . . . are within the direct
> knowledge and control of management . . . . Thus, the fair presentation of
> financial statements in conformity with Generally Accepted Accounting
> Principles is an implicit and integral part of management's responsibility.

**Internal Control Deficiencies**

33.     The Company also suffered from a chronic and systematic

breakdown of its internal accounting controls, which rendered MBNA's financial

reporting unreliable and incorrect, resulting in materially false and misleading financial

statements.

34.     Section 13(b)(2)(B) of the Exchange Act requires every issuer that

has securities registered pursuant to Section 12 of the Exchange Act, such as MBNA to:

(A) make and keep books, records and accounts which, in reasonable detail, accurately

and fairly reflect the transactions and disposition of the assets of the issuer; and (B)

devise and maintain a system of internal accounting controls sufficient to reasonably

assure, among other things, that transactions are recorded as necessary to permit

preparation of financial statements in conformity with GAAP. These provisions require

an issuer to employ and supervise reliable personnel, to maintain reasonable assurances

that transactions are executed as authorized, to properly record transactions on an issuer's

books and, at reasonable intervals, to compare accounting records with physical assets.

35.     MBNA failed to implement and maintain an adequate internal

control system, in a manner that would ensure compliance with GAAP, which

13

Defendants knew or recklessly disregarded, resulting in materially false and misleading financial statements, despite the fact that MBNA's CEO and CFO regularly signed certifications attesting to the adequacy of the Company's internal controls.

MBNA's False and Misleading Class Period Financial Statements Were Material

36.     The foregoing violations of GAAP were material.  Staff Accounting Bulletin No. 99 ("SAB 99), emphasizes the need to assess and take into account the qualitative aspects of materiality, including, but not limited to:

(a)     Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

(b)     Whether the misstatement masks a change in earnings or other trends;

(c)     Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

(d)     Whether the misstatement changes a loss into income or vice versa;

(e)     Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(f)     Whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

**Violations of SEC Regulations**

37.     Item 7 of Form 10-K and item 2 of Form 10-Q, Management

discussions and Analysis of Financial Condition and Results of Operations ("MD&A"

require the issuer to furnish information required by Item 303 of Regulation S-K

[17.C.F.R.229.303]. In discussing results of operations, Item 303 of Regulation S-K

requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or unfavorable
> impact on net sales or revenues or income from continuing operations.

38.     In addition, the SEC in its May 1989 Interpretive Release No. 34-

26831, has indicated that registrants should employ the following two step analysis in

determining when a known trend or uncertainty is required to be included in the MD&A

disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, event or uncertainty is
> both presently known to management and is reasonably likely to have a
> material effect on the registrant's financial condition or results of
> operations.

**Additional GAAP Violations**

39.     In addition to the accounting improprieties stated above, MBNA

presented its financial statements during the Class Period in a manner which also violated

at least the following provisions of GAAP:

        a.      The concept that financial reporting should provide

information that is useful to present and potential investors and creditors and other users

in making rational investment, credit and similar decisions (Concepts Statement No. 1,

¶ 34);

b.       The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

c.       The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

d.       The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

e.       The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

f.       The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

g.    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

## ADDITIONAL SCIENTER ALLEGATIONS

40.    As discussed above, Defendants deceived the investing public for their personal financial advantage, artificially inflating the price of MBNA stock so that they could engage in the following Class Period insider sales transactions:

**John Cochran: COO**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/27/2005 | 398,150 | 26.51 | 10,554,040.76 |
| 1/27/2005 | 133,009 | 26.55 | 3,531,388.95 |
| | 531,159 | | 14,085,429.71 |

**Louis Freeh: Director**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/31/2005 | 18,054 | 26.45 | 477,528.30 |

**Bruce Hammonds: CEO and President**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/27/2005 | 351,409 | 26.51 | 9,315,044.35 |

**Charles Krulak: Chief Accounting Officer**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 2/1/2005 | 224,754 | 26.75 | 6,012,169.50 |
| 2/1/2005 | 50,217 | 27 | 1,355,859.00 |
| 1/31/2005 | 92,483 | 26.5 | 2,450,799.50 |
| 1/25/2005 | 130,000 | 26.61 | 3,459,547.00 |
| | **497,454** | | **13,278,375.00** |

**Michael Rhodes: Vice Chairman**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/25/2005 | **406,040** | 26.76 | **10,865,346.17** |

**John Scheflen: Corporate Secretary**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/25/2005 | **125,810** | 26.85 | **3,378,501.74** |

**Richard Struthers: Vice Chairman**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 2/3/2005 | **457,464** | 26.84 | **12,277,922.04** |

**Kenneth Vecchione: CFO**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/25/2005 | 79,829 | 26.7 | 2,131,434.30 |
| 1/25/2005 | 20,633 | 26.8 | 552,964.40 |
| | **100,462** | | **2,684,399** |

**Lance Weaver: Vice Chairman**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/25/2005 | **376,835** | 26.76 | **10,085,574.26** |

18

**Total Shares Sold**        2,864,687
**Total Sales Proceeds**    $76,448,120

41.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding MBNA and its business practices, their control over and/or receipt of MBNA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MBNA, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

42.     The Individual Defendants engaged in such a scheme to inflate the price of MBNA securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of MBNA securities; and (iii) reap enormous profits from the exercise of their stock options and the sale of MBNA securities.

## STATUTORY SAFE HARBOR

43.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of MBNA who knew that those statements were false when made. Further, the clear language of the Private Securities Litigation Reform Act expressly excludes from the safe harbor protection statements that are "included in a financial statement prepared in accordance with generally accepted accounting principles." *In re Sunbeam Sec. Litig.,* 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999); 15 U.S.C. § 78u-5(b)(2)(A).

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

        a.     Defendants made public misrepresentations or failed to disclose facts during the Class Period;

        b.     The omissions and misrepresentations were material;

20

     c.     MBNA securities traded in an efficient market;

     d.     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

     e.     Plaintiff and the other members of the Class purchased MBNA securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

     45.     At all relevant times, the market for MBNA securities was an efficient market for the following reasons, among others:

     a.     MBNA securities were listed and actively traded during the Class Period on the NYSE, an open, highly efficient and automated market.

     b.     As a regulated issuer, MBNA regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC.

     c.     MBNA was followed by analysts from major brokerages. The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large; and

     d.     MBNA regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

     46.     As a result, the market for MBNA securities digested current information regarding the Company from the publicly available sources described above

and reflected such information in the prices of MBNA's securities. As would be expected where a security is traded in an efficient market, material news concerning MBNA's business had an immediate effect on the market price of MBNA's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of MBNA's corrective disclosures as described herein. Under these circumstances, all purchasers of MBNA's securities during the Class Period suffered similar injury due to the fact that the price of MBNA securities was artificially inflated throughout the Class Period. At the times they purchased or otherwise acquired MBNA's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies. Plaintiff will also rely, in part, upon the presumption of reliance established by a material omission.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

47.     Plaintiff repeats the allegations set forth above as though fully set forth herein. This claim is asserted against MBNA and the Individual Defendants.

48.     During the Class Period, Defendants, carried out a plan, scheme and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MBNA common stock; and (iii) cause Plaintiff and other members of the Class to purchase MBNA stock at artificially inflated prices during the Class Period. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

22

49.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for MBNA common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein, and as controlling persons of MBNA, as alleged below.

50.     In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly-traded securities would be based on truthful, complete and accurate information.

51.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MBNA as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information

23

and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA securities during the Class Period.

52.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Individual Defendants were all high-level executives and/or directors at the Company during the Class Period; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

53.     Defendants had actual knowledge of the severe misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the

24

truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MBNA's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBNA's common stock was artificially inflated during the Class Period. Unaware of the fact that the market price of MBNA's shares was artificially inflated, and relying (directly or indirectly) on Defendants' false and misleading statements, or on the integrity of the market in which the securities are traded, and/or on the absence of material, adverse information known to or recklessly disregarded by Defendants (but not disclosed to the public) during the Class Period, Plaintiff and the other members of the Class acquired MBNA common stock during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were unaware of their falsity, and believed them to be true.

25

Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and true value of MBNA, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have acquired their MBNA securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their acquisition of the Company's securities during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS

58. Plaintiff repeats the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

59. Individual Defendants were, and acted as, controlling persons of MBNA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to the Company's reports, press releases,

26

public filings and other statements alleged by Plaintiff to be false and misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the

issuance of the statements or cause the statements to be corrected.

60.    In addition, Individual Defendants had direct involvement in the

day-to-day operations of the Company and, therefore, is presumed to have had the power

to control or influence the particular transactions giving rise to the securities violations as

alleged herein, and exercised the same.

61.    As set forth above, Individual Defendants violated Section 10(b)

and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of

their controlling positions, Individual Defendants are liable pursuant to Section 20(a) of

the Exchange Act. As a direct and proximate result of these Defendants' wrongful

conduct, Plaintiff and other members of the Class suffered damages in connection with

their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for

judgment as follows:

a.    Declaring this action to be a class action pursuant to Rule

23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined

herein;

b.    Awarding Plaintiff and the other members of the Class

damages in an amount which may be proven at trial, together with interest thereon;

c.    Awarding Plaintiff and the members of the Class pre-

judgment and post-judgment interest, as well as their reasonable attorneys' and experts'

witness fees and other costs;

        d.      Ordering an accounting of Defendants' insider trading

proceeds

        e.      Awarding preliminary and permanent injunctive relief in

favor of plaintiffs and the Class against Defendants, including an accounting and the

imposition of a constructive trust and/or an asset freeze on Defendants' insider trading

proceeds; and

        f.      Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

| Date: May 20, 2005 | Respectfully submitted, |
|---|---|
| | **MILBERG WEISS BERSHAD & SCHULMAN LLP** |
| | Seth D. Rigrodsky (#3147) |
| | Ralph N. Sianni (#4151) |
| | Brian D. Long (#4347) |
| | 919 N. Market Street, Suite 411 |
| | Wilmington, DE 19801 |
| | (302) 984-0597 (Tel) |
| | (302) 984-0870 (Fax) |
| | *- and -* |
| | Steven G. Schulman |
| | **MILBERG WEISS BERSHAD & SCHULMAN LLP** |
| | One Pennsylvania Plaza |
| | New York, NY 10119 |
| | (212) 594-5300 |
| | (212) 868-1229 (fax) |
| | **SEEGER WEISS LLP** |
| | Stephen A. Weiss |
| | Eric T. Chaffin |
| | Roopal Luhana |
| | One William Street |
| | New York, NY 10004 |
| | (212) 584-0700 |
| | (212) 584-0799 (fax) |

28

|   | **Law Offices Of Charles J. Piven, P.A.**<br>The World Trade Center-Baltimore,<br>401 East Pratt Street, Suite 2525,<br>Baltimore, Maryland 21202<br>Tel.: (410) 986-0036 |
|---|---|

## PLAINTIFF'S CERTIFICATION

_____CLIFFORD   W. JONES_ ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.     Plaintiff's transactions in MBNA Corp. securities during the Class Period are as follows: (Complete only one trade per line; place any additional trades on the attached sheet)

| # of Shares | Purchased (P) / Sold (S) | Price Per Share | Date of Purchase/Sale |
|---|---|---|---|
| 300 | (P)  PURCHASED | $ 26.19 | 2/16/05 |
| | | | |
| | | | |

5.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.  Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _9TH_ day of _____MAY_____ 2005.

_____Clifford W. Jones_____