# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS J. CUSSEN, On Behalf of Himself and All Others Similarly Situated, | §<br>§<br>§<br>§ | Civil Action No. |
| Plaintiff, | §<br>§ | |
| vs. | §<br>§ | |
| MBNA CORP., BRUCE L. HAMMONDS, KENNETH A. VECCHIONE, RICHARD K. STRUTHERS, CHARLES C. KRULAK, JOHN R. COCHRAN, III, MICHAEL G. RHODES, LANCE L. WEAVER and JOHN W. SCHEFLEN, | §<br>§<br>§<br>§<br>§<br>§<br>§ | **JURY TRIAL DEMANDED** |
| Defendants. | | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff individually and on behalf of all other persons similarly situated, by his

undersigned attorneys, for his complaint against defendants, alleges the following based

upon personal knowledge as to himself and his own acts, and upon information and belief

as to all other matters, based on, inter alia, the investigation conducted by and through his

attorneys, which included, amongst other things, a review of the defendants' press

releases, Securities and Exchange Commission ("SEC") filings by MBNA Corp.

("MBNA" or the "Company") and media reports about the Company. Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired MBNA securities ("the "Class") during the period October 16, 2003 and April 21, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

3.      Venue is proper in this District pursuant to §27 of the 1934 Act.  The corporate headquarters of MBNA are located in the District.

4.      In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5.      Plaintiff, Thomas J. Cussen, as set forth in the accompanying certification, incorporated by reference herein, purchased publicly traded shares of MBNA stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

6.      Defendant MBNA is a bank holding company and the parent of MBNA

2

America Bank, N.A., a national bank. MBNA America has two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issue credit cards in the United Kingdom, Ireland, Spain, and Canada. The Company is headquartered at 1100 North King Street, Wilmington, Delaware and has over 1.277 billion shares of common stock issued and outstanding which trade on the NYSE under the ticker symbol "KRB."

7.       Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30, 2003, Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Hammonds has been a director of MBNA since 1986. Hammonds has 35 years of management experience in consumer lending and was a member of the management team that established MBNA in 1982. During the Class Period, Hammonds sold more than $9 million worth of his MBNA stock.

8.       Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Vecchione is responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. Vecchione spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Vecchione sold more than $2.6 million worth of his MBNA stock.

9.       Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Struthers is also a director and serves as Chief Loan

3

Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada. In addition, Struthers is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware. Struthers is responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program. Struthers has 27 years of experience in consumer lending and was a member of the management team that established MBNA America in 1982. During the Class Period, Struthers sold more than $12 million worth of his MBNA stock.

10.  Defendant Charles C. Krulak ("Krulak") was Vice Chairman of MBNA and MBNA America. Krulak was responsible for corporate development and acquisitions, personnel, compensation and benefits, and education and career development. Krulak previously served as CEO of MBNA Europe. During the Class Period, Krulak sold more than $13 million worth of his MBNA stock.

11.  Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America. Cochran previously served as the Chief Operating Officer and Chief Marketing Officer of MBNA America. Cochran has 32 years of management experience in the financial services industry and was a member of the management team that established MBNA America in 1982. Cochran has been a director of MBNA America since 1986. During the Class Period, Cochran sold more than $14 million worth of his MBNA stock.

12.  Defendant Michael G. Rhodes ("Rhodes") was Group Executive for the U.S. Credit Card Business Development division of MBNA. Rhodes spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Rhodes sold more than $10.8 million worth of his MBNA stock.

4

13.     Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Weaver is responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Weaver also serves as a board member and former chairman of MasterCard International Inc. Weaver has 30 years of experience in consumer lending and administration and has been with the Company for 14 years. Weaver has been a director of MBNA America since 1993. During the Class Period, Weaver sold more than $10 million worth of his MBNA stock.

14.     Defendant John W. Scheflen ("Scheflen") was Vice Chairman of MBNA America. Scheflen also serves as Secretary of MBNA and MBNA America. Scheflen is responsible for corporate governance, compliance, information security, operational risk management, and portfolio risk management. During the Class Period, Scheflen sold more than $3.3 million worth of his MBNA stock.

15.     The individuals named as defendants in ¶¶8-15 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of

5

these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶51-88, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

16.     In addition to the above-described involvement, each Individual Defendant had knowledge of MBNA's problems and was motivated to conceal such problems. Vecchione, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing MBNA's forecasted and actual growth were prepared by the finance department under Vecchione's direction. Defendant Hammonds, as CEO and Chairman, and the other officer defendants named herein were responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

17.     Defendants were motivated to engage in the fraudulent practices alleged herein in order to sell over $75 million worth of their personally held MBNA stock to make up for their decreased salaries and bonuses and to justify the receipt of millions of dollars in bonuses in January 2005.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

18.     Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about MBNA. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBNA publicly traded securities was a success, as it (i) deceived the investing public regarding MBNA's

6

prospects and business; (ii) artificially inflated the price of MBNA's publicly traded securities; (iii) allowed defendants to obtain larger bonuses which were directly tied to the Company's falsified performance; (iv) allowed defendants to arrange to sell and actually sell in excess of $75 million worth of MBNA shares at artificially inflated prices; and (v) caused plaintiff and other members of the Class to purchase MBNA publicly traded securities at inflated prices.

19.    Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about MBNA. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBNA publicly traded securities was a success, as it (a) deceived the investing public regarding MBNA's prospects and business; (b) artificially inflated the prices of MBNA's publicly traded securities; and (c) caused plaintiff and other members of the Class to purchase MBNA's publicly traded securities at inflated prices.

## OVERVIEW OF THE CASE

20.    MBNA is an international financial services company providing retail lending, deposit, and credit insurance products and services to its customers. In addition to being the world's largest independent credit-card company, MBNA makes other consumer loans to individuals and commercial loans primarily to small businesses. MBNA is the No. 3 U.S. credit card issuer, and the Company, which went public in 1991, had a stock market value of approximately $35 billion at the start of the Class Period.

21.    At the end of fiscal year 2003, U.S. credit card issuers understood the changing paradigm regarding consumer use and reliance on credit cards. Profits now heavily depended on "renting money" to those consumers who typically made minimum

7

payments on their credit card debt. Issuers seeking to access these consumers now faced fierce competition. With the average American now carrying three credit cards, the days of rapid expansion were over for the industry. Consumers could force – and rapidly were forcing – credit card companies to compete by moving credit card balances from card to card based on which company was offering the best terms. Credit card companies – forced to offer no-interest promotional rates and to increasingly extend the no-interest periods in order to lure in new customers – were seeing their profit margins dwindle.

22.     In periods of high competition among card issuers, so-called "teaser" no-interest lending is costly for credit card companies because they incur all of the transactional and capital costs of providing free financing to new borrowers during the teaser period, but many borrowers simply choose to move the balance to another lender offering a competing teaser at the end of the promotional period.

23.     The Class Period begins on October 16, 2003, whereupon defendants made false and misleading statements regarding the growth and direction of MBNA loan receivable assets. Defendants used false and deceptive means to present a healthy picture of growth for its loan receivable assets, to conceal several serious quarter over quarter declines, including a decline of 3.4% or $1 billion in loan receivables during the third quarter of 2003 and an astonishing decline of 10.4% or $3.5 billion during the first quarter of 2004. These declines align with a steep decline in defendants' structured financing activities, a decline that had an adverse impact on defendants' attempts to manage the cost of money in an increasing interest rate environment.

24.     MBNA and its executives faced another problem during the Q1 2005. Shareholder upheaval surrounded the Company's 2004 annual meeting of shareholders,

8

with large institutional investors demanding increased board independence and reductions in the extraordinary executive compensation MBNA's Board had been providing to its top executives. (MBNA's CEO had ranked number one in compensation among all U.S. executives in 2003, receiving $45.5 million.) As a result, certain Board members were replaced with ostensibly "independent" directors in 2004 and, by early January 2005, the Company's CEO's salary had been cut 34% and the salaries of its top five highest executives were cut a combined average of 37%.

25.    However, these same executives were each sitting on tens of millions of dollars worth of stock options and shares of restricted stock which had been granted to them – all of which, defendants knew, would rapidly decline in value if the truth about MBNA's market conditions, business operations and financial prospects came to light. As a result, as MBNA's competitors lowered their guidance for 2005 in light of decreasing credit card revenues and increasing advertising expenses, on January 21, 2005, the start of the Class Period, MBNA issued the first earnings forecast in the Company's history, projecting an ongoing 12% earnings increase – with a 10% increase in 2005 earnings over 2004's.

26.    Defendants said MBNA would make this target because the Company had already drastically reduced its own reliance on insidious no-interest loans, rendering its own loan portfolio more profitable than that of its competitors. Defendants also projected a 20%+ increase in Return on Equity. Defendants' EPS estimate for 2005 was $2.36 per share, which was 10% above the Company's 2004 EPS. These projections were being made nearly one-third of the way into the Q1 2005 and would be repeated and detailed at the Company's January 21, 2005 and February 9, 2005 investor conferences.

9

27.    Defendants also primed the market by announcing an increase in the Company's dividend to 17% and a $2 billion stock buyback program. Defendants promised "consistent, profitable growth" for MBNA despite the competition in the industry because MBNA would not get sucked into the teaser no-interest rate promotional game.

28.    But on April 21, 2005, defendants shocked the market by disclosing MBNA had earned only $0.02 cents in Q1 2005 – a 94% decline from the $0.59 per share it reported in Q4 2004 -- and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate.

29.    The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a) As early as the third quarter of 2003, securitization of credit card receivables was in decline and the decline remained an alarming component of defendants' structured financing activities throughout the Class Period;

(b) The quarterly comparison defendants engineered to report loan receivable assets was deceptive, since it totally obscured meaningful and important trends in the direction of asset growth of over time;

(c) Loan receivables had contracted several times during the Class Period, with the most severe contraction occurring during the first quarter of 2004, when *loan receivables plummeted 10.4% or $3.5 billion versus 4Q03;*

(d) The addition of millions of new customer accounts in 2004 had not contributed to growth in loan receivables and stood in stark contrast with a contraction in loan receivables during a number of quarterly reporting periods;

10

(e)   That the Company had experienced "unexpectedly high payment volumes from U.S. credit card customers", reducing managed loans and causing loan receivables to decrease by billions of dollars during the Class Period;

(f)   Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(g)   MBNA had suffered several unseasonably sharp contractions in lending during the Class Period, including a contraction during Q1 2005, causing total managed loans to decrease $5 billion by the end of Q1 2004;

(h)   The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(i)   MBNA was experiencing higher-than-expected delinquencies during the Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(j)   The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(k)   Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4 2004;

(l)   Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(m)   Due to the increase in pre-pays, the interest-only securitization

11

strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(n) The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

30.    As a result of the defendants' false statements, MBNA's stock traded at inflated levels during the Class Period which permitted the Company's top officers and directors to sell more than $75 million worth of their own shares. During the Class Period defendants also caused the Company repurchase $250 million worth of its own stock which supported the stock's high price. Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to them in January 2005.

31.    Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization lost over $5.8 billion in one trading session and its credibility with the investment community has been profoundly damaged.

## BACKGROUND AND DEFENDANTS' PRE-CLASS STATEMENTS
### "Revolvers" and Securitization Concepts

32.    The indispensable feature of today's retail credit card lending equation is the "revolver" – those consumers making minimum payments on their credit card debt. This equation recognizes the predictability and risks of "renting money" to revolvers,

reducing those parameters into a risk-adjusted spread to treasury notes or other indices. This in turn allows credit card issuers to securitize their receivables, as debt "swaps", commonly referred to as credit card securitization notes or bonds.

33.  Large credit card issuers, including MBNA, routinely use "master trusts" to issue "tranches" of securitized notes ("bonds"), using the spread and a subordination scheme, with repayment coming from a single pool of credit card receivables. Bond rating agencies typically rate securitization bonds in accordance with subordination risks. Since securitization creates a "revolving" debt structure, the overall result is a variable cost of money, changing as outstanding notes are repaid, new notes are issued and as the indices for variable rate notes change. Finally, performance, legal or seller/servicer difficulties can trigger "early amortization", causing the issuer to make early repayment of the notes. For example, a declining credit card receivables pool resulting from increased competition can trigger early amortization and note repayments.

34.  Securitization bond issuance generates income for MBNA in the form of an interest-only ("IO") strip receivable. When MBNA securitizes its loan principal receivables, it recognizes a gain on sale and retained beneficial interests, including the IO strip receivable. The IO strip receivable represents MBNA's contractual right to receive interest and other revenue, less certain costs from the trust, over the estimated life of the securitized loan principal receivables. (See defendants' SEC Form 10Q filed on August 9, 2004)

35.  MBNA securitization bond offerings are made once credit card receivables are generated and are not tied to any particular schedule or quarterly event. For this reason, securitization is a "lagging" indicator of growth in defendants'

13

receivables. Trend analysis, looking at the rate of "growth" in the dollar amount of securitization bonds issued by MNBA versus time should provide insight into its success and prospects as a credit card issuer, including, amongst other factors, customer retention and market penetration. Assuming the predictability of positive cash flows from "renting money" to "revolvers", MBNA marketing and lending practices over time could also influence the level of securitization activity. The following multiyear plot of the issuance of MBNA securitization notes provides insight into historical performance and future prospects of the MBNA credit card business:

36.    The securitization graph shows MBNA note issuance in semiannual increments. Although volatility seems to be a feature of this measure, trends are clearly evident. For example, when compared with securitizations during the first six months of 1998, securitizations during the first six months of 2000 grew almost $4 billion or nearly 200%. That trend parallels the historical growth of MBNA's credit card business, specifically the expansion of MBNA's credit card receivables pool. While securitizations declined again during the first six months of 2001, securitizations returned again to previous levels and remained high through the first half of 2003.



37.     However, MBNA securitization note issuance during the second half 2003 dropped $1 billion or 20%, in comparison with the first half of 2003. This drop signaled the start of an alarming trend, – and by the second half of 2004, securitizations had fallen 60%, for a staggering $3 billion, when compared to the first half of 2003. This steep in securitized note issuance dropped to a level not seen since the first half of 1998.

38.     Securitization notes are repaid out of a pool generated from credit card receivables, including monthly credit card principal and interest payments. Hence, just as the increase in note issuance between 1998 and 2000 paralleled MBNA's historical growth, *the staggering 60% drop between 2003 and 2005 signaled a historical decline in the profitability of MBNA credit card business, presumably the result of a contraction in the rate of growth or size of the credit card receivables pool.*

15

**Aggressive Consumer Practices**

39.    The decline in credit card note securitizations beginning in the second half of 2003 presented MBNA with prospects for *an increased cost of money.* When faced with the prospect of a contraction in the credit card receivables pool, MBNA's cost of money increases, as it is forced to repay securitization notes in the order dictated by subordination, beginning with less expensive, longer-term notes first.

40.    As a middleman in a complex securitization scheme, MBNA obviously can attempt to pass these increased costs on to customers, in the form of increased credit card interest rates and fees. These attempts occurred, with MBNA pressing diamatic hikes in interest rates and monthly payments, in 2003 and continuing into the Class Period. However, since credit card lending is also highly and increasingly competitive, with customers free to move their balances elsewhere, *these tactics delayed and concealed the potential negative impacts of MBNA's increased cost of money, since they serve to "cannibalize" the customer base and contract the credit card trust receivables pool.*

**Nepotism and Compensation Concepts**

41.    Having been run by a closely knit group of officers and directors, MBNA's executives grew all too accustomed over the years to receiving absurd levels of executive compensation. During 2001 to 2003, the Company's top five most highly paid officers alone received well over $60 million in cash compensation – not counting the tens of thousands of stock options and shares of restricted stock they also received:

16

| Defendant/Yr. | Salary | Bonus | Total Cash Compensation |
|---|---|---|---|
| Hammonds | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Cochran | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Weaver | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Struthers | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Vecchione | | | |
| 2003 | $1.6 M | $1.4 M | $2.7 M |
| 2002 | $1.5 M | $1.6 M | $3.1 M |
| 2001 | | not disclosed | |

42.     As reported by the Philadelphia Inquirer on April 25, 2005, it had become an old joke in Wilmington that the "initials in MBNA, the credit-card lender once known as Maryland Bank, National Association, also stood for 'Mothers, Brothers, Nephews and Aunts.'" In fact, under founder Charles M. Cawley ("Cawley"), MBNA had a developed a "penchant" for hiring via friendship, blood and marriage – including Cawley's own relatives and in-laws. MBNA's recent proxy statement filed with the SEC on March 15, 2005 reveals the names and cash compensation of 15 employees who are related to senior managers whom Cawley hired. According to the Philadelphia Inquirer article:

Among others, MBNA employs:

Two brothers, three brothers-in-law and a sister-in-law of John R. Cochran, MBNA's chief operating officer. Cochran collected $18 million in cash, stock grants and options profit last year. His brothers, at $370,000 and $293,000, make more than any of his four MBNA-employee in-laws, whose pay ranged from $92,000 to $175,000.

Two brothers and a brother-in-law of vice chairman Lance L. Weaver. Weaver collected $11 million. His family members' pay ranged from $952,000 for Todd Weaver, head of MBNA's Western Regional Office, to a comparatively modest $63,428 for Drew Weaver.

Since Cawley retired from active management at the end of 2003, his own relatives on the MBNA payroll weren't listed, bank spokesman Jim Donahue said. However, Cawley himself is on the list: He's named as "father-in-law of Michael G. Rhodes," the current group executive for U.S. credit card business development.

Cawley, who made hundreds of millions of dollars from MBNA stock options during his long tenure, has remained senior adviser to the company. He collected $2.5 million in cash for his services in 2004. The company said he will retire from that position in August.

43.     The Company's Board of Directors lacked independence as well. In early 2004, the Board consisted of the following nine directors:

• James H. Berick, Esq.: Retired Partner, Squire, Sanders & Dempsey L.L.P. (successor to Berick, Pearlman & Mills Co., L.P.A., of which Mr. Berick was Chairman from July 1986 until January 2000), a law firm which received substantial compensation for legal services provided to the Company. Berick's son is a partner at Squire, Sanders & Dempsey. Berick has ties to the Lerner family going back decades. He was Al Lerner's college roommate and is godfather to Randolph Lerner, who became MBNA's Chairman after his father's death. A member of MBNA's Board since 1991, he was the Lerner family's lawyer and he still provides advice to the Lerner family. He is also a director of the Town and Country Trust, a real estate investment trust with longstanding ties to the Lerner family.

• Benjamin R. Civiletti, Esq.: Chairman, Venable LLP, a law firm which has received substantial compensation for legal services provided to the Company. One of Civiletti's sons, also a lawyer, is employed in MBNA's legal department.

• Bruce L. Hammonds: President and CEO of MBNA.

18

- William L. Jews.

- Randolph D. Lerner, Esq.: Owner of the Cleveland Browns football team. In 1999, the Board approved a 10-year marketing agreement with the Cleveland Browns football team, then owned by Al Lerner and now owned by Randolph D. Lerner, MBNA's Chairman.

- Stuart L. Markowitz, M.D.

- William B. Milstead: Retired Partner, Ernst & Young LLP, the Company's certified public accountant. Milstead served as the coordinating partner for MBNA at the time of its initial public offering in 1991.

- Norma Lerner: Widow of Company co-founder Al Lerner.

- Michael Rosenthal: Professor of English at New York's Columbia University, Al Lerner's alma mater.

James Berick was Chairman of MBNA's compensation committee, which decided on the pay for Lerner and co-founder Cawley. Cawley, who retired in December 2003, received total compensation of $45.5 million in 2003, putting him at the top of the U.S. list for CEO pay, according to a 2004 survey by Bloomberg News.

44.     MBNA came under intense pressure from shareholders in advance of the May 2004 annual meeting of shareholders who argued that the directors had become too cozy with the executives they were supposed to watch over. Preceding the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. As a result, Norma Lerner and Michael Rosenthal were removed from the Company's Board.

45.     As a result of the lack of independence on the MBNA Board of Directors, MBNA's executives had become accustomed to receiving very heady compensation. In fact, the Company now admits it had previously followed what it describes as "a policy of providing high levels of compensation." Following the shareholder-led shakeup of the

MBNA Board in 2004, the Compensation Committee finally conceded to making significant reductions in executive compensation.

46.     By early 2005 the Compensation Committee had approved reductions of salaries, bonuses and equity awards which would result in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly compensated executive officers.

47.     As a result of these cuts, at the beginning of the Class Period the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving. At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which will expire if not exercised by the expiration date. The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. Some of these stock options would have expired in 2005 if not exercised. Defendants knew the value of these options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

48.     Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to senior executives. As a result of defendants' concealment of the Company's true operating and financial status, for 2004 defendants

determined that the Company had "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin."

49. Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004 were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future." As a result, in January 2005 the Compensation Committee awarded a performance bonus to Hammonds equal to 90% of his 2004 salary (as reduced in August 2004) and awarded bonuses to Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries (as reduced in August 2004). Based on the Company's purportedly stellar performance, defendants bequeathed the Company's top five highest-paid executives alone over $200 million worth of performance bonuses and restricted stock awards (which vest 20% per year over five years and require no payment to exercise):

| Defendant | 2004 Bonus | Value of Restricted Shares Upon Grant | Total 2004 Incentive Compensation Award |
|-----------|-----------|---------------------------------------|------------------------------------------|
| Hammond   | $1.083 M  | $1.083 M                              | $2.17 M                                  |
| Cochran   | $943,000  | $943,000                              | $1.89 M                                  |
| Weaver    | $1.962 M  | $1.962 M                              | $3.92 M                                  |
| Struthers | $1.962 M  | $1.962 M                              | $3.92 M                                  |
| Vecchione | $1.569 M  | $1.569 M                              | $3.14 M                                  |

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

50.     On October 16, 2003, defendants issued a press release entitled, "MBNA

Reports Record Earnings for the Third Quarter." The press release stated in part:

> WILMINGTON, Del., Oct. 16 /PRNewswire-FirstCall/ -- MBNA
> Corporation (NYSE: KRB) announced today that net income for the third
> quarter of 2003 was $658.8 million or $.51 per common share, an increase
> of 70%, compared with $398.0 million or $.30 per common share for the
> third quarter of 2002. For the first nine months of this year, net income
> rose to $1.635 billion or $1.25 per common share, an increase of 34%
> compared with the first nine months of 2002. In September 2002, the
> Corporation implemented the industry wide FFIEC guidance for
> uncollectible accrued interest and fees for its loans. Excluding this change
> in 2002, earnings per common share would have been $.43, for the third
> quarter of 2002 and $1.06, for the first nine months of 2002. Earnings per
> common share for the third quarter of 2003 and for the first nine months of
> 2003 compared to the same period in 2002, excluding the change, would
> have increased 19% and 18%, respectively.
>
> **Loan receivables at September 30, 2003 were $28.8 billion, an
> increase of $2.5 billion over third quarter of 2002. Total managed loans
> at September 30, 2003 were $112.8 billion, an increase of $10.0 billion
> or 10% over the third quarter of 2002.**
>
> During the first nine months of 2003, the Corporation added 8.0 million
> new accounts, with 2.7 million new accounts added in the quarter. The
> characteristics of new cardholders are consistent with the quality of the
> Corporation's existing cardholders. In the United States, the typical new
> cardholder has more than a $70,000 annual household income, has been
> employed for more than 11 years, owns a home, and has a 18-year history
> of paying bills promptly. The company acquired 310 new endorsements
> from organizations and renewed more than 900 group contracts during the
> first nine months of 2003.
>
> Loan losses on loan receivables and managed loans for the third quarter
> of 2003 were 4.70% and 5.13%, respectively. In the month of September
> 2003, loan losses were 4.68% on loan receivables and 5.02% on managed
> loans. Loan losses continue to be lower than published industry levels.
> Delinquency on the loan receivables and managed loans was 3.75% and
> 4.48%, respectively, at September 30, 2003.

51.     The press release of October 16, 2003 was false and misleading for the

following reasons. First, it presents an illusion of significant growth in loan receivables,

22

by comparing loan receivables at the end of 3Q03 with loan receivables at the end of 3Q02, to report a 9.4% increase, or $4.9 billion. However, this measure is not a quarter to quarter comparison. It is instead a statement of the increase in loan receivables for the 12 month period ending on September 30, 2003. Had defendants compared loan receivables versus the previous quarter ending on June 30, 2003, defendants would have alarmed investors, by reporting *a decline of 3.4% or $1 billion in loan receivables versus 2Q03.* Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

52.    As already stated, MBNA securitization note issuance during the second half of 2003 had *dropped $1 billion or 20%, in comparison with the first half of 2003.* (MBNA's SEC Form 10Q issued on November 14, 2003) Since MBNA securitization note issuance is driven by loan receivables, this drop points to a significant contraction in loan receivables during 3Q03. Nevertheless, defendants signaled to investors that the business was growing rapidly, through the addition of 8 million new accounts, with 2.7 million added in 3Q03, as an alternative and misleading "positive" measure of receivables growth. Thus, defendants' illusory presentation of significant growth for 3Q03 actually concealed a significant contraction in loan receivables, information that investors needed to make prudent judgments about the progress and future prospects of MBNA's business.

53.    On January 22, 2004, defendants issued a press release entitled, "MBNA Reports Record Earnings for the Fourth Quarter." The press release stated in part:

> MBNA Corporation (NYSE: KRB) announced today that net income for the fourth quarter of 2003 was $703.5 million or $.54 per common share, an increase of 32%, compared with $540.2 million or $.41 per common share for the fourth quarter of 2002. For the full year, net income rose to

23

$2.34 billion or $1.79 per common share, compared with $1.77 billion or $1.34 per common share for 2002. Excluding the impact of the third quarter 2002 implementation of the industry-wide FFIEC guidance for uncollectible accrued interest and fees for the Corporation's loans, earnings per common share would have been $1.47 for the full year of 2002.

In addition, MBNA's Board of Directors has approved an increase of 20% in the quarterly dividend rate to $.12 per common share, which will increase the annual rate to $.48. MBNA has increased the dividend every year since it became a public company. The cash dividend is payable April 1, 2004 to stockholders of record as of March 15, 2004.

*Loan receivables at December 31, 2003 were $33.6 billion, an increase of $4.9 billion over the fourth quarter of 2002. Total managed loans at December 31, 2003 were $118.5 billion, an increase of $11.2 billion or 10.5% over the fourth quarter of 2002.*

During 2003, the Corporation added 10.7 million new accounts, with 2.7 million new accounts added in the quarter. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. The company acquired 384 new endorsements from organizations in 2003, including Merrill Lynch, Arizona State University, Gander Mountain, National Geographic (U.K.), Banco Cooperativo (Spain), eBay, and Royal Caribbean International. The company also renewed more than 1,400 group contracts during 2003, including the NFL, University of Michigan, Cleveland Indians, American College of Surgeons, University of Arizona, The American Society of Mechanical Engineers, Texas A&M University, and WWF (U.K.).

Loan losses on loan receivables and managed loans for the fourth quarter of 2003 were 4.64% and 4.97%, respectively. For the full year, loan losses were 4.84% on loan receivables and 5.22% on managed loans. Loan losses continue to be lower than published industry levels. Delinquency on the loan receivables and managed loans was 3.84% and 4.39%, respectively, at December 31, 2003.

54.    The press release of January 22, 2004 was false and misleading for the following reasons. Defendants overstated the growth in loan receivables, by comparing loan receivables at the end of 4Q03 with loan receivables at the end of 4Q02, to report an increase of 17.0% or $4.9 billion. However, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12

24

month period ending on December 31, 2003. Had defendants compared loan receivables versus the previous quarter ending September 30, 2003, defendants would have reported a larger increase, of 17.3% or $5.3 billion. More importantly, comparison of 4Q03 loan receivables with the prior quarter would also have signaled to investors a strong connection between the record 4Q03 profits and the atypical and unusually large nature of the increase in loan receivables during the quarter, as opposed to the false and misleading impression of a prolonged quarter over quarter growth trend. Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

55.     On April 16, 2004, defendants issued a press release entitled "MBNA Opens Representative Office in China - World's Largest Independent Credit Card Issuer Plans Entry in China". The press release stated in part:

> MBNA today announced the opening of a Representative Office in Shanghai, China. MBNA will use the office to conduct market research, to further develop relationships with Chinese regulators and the banking community in China, and to design long-term strategies for entering China's credit card market.
>
> "We believe the opportunity to participate in building a strong credit card market in China is very promising," said Lance L. Weaver, Vice Chairman of MBNA Corporation. "Personal income in China is growing rapidly and consumer confidence is high. There is a growing demand for credit services," Mr. Weaver added.
>
> Use of consumer credit products is relatively new in China, but in recent years consumer loans, including mortgages and auto loans, have increased to over $160 billion. This growth suggests that consumers in China are willing to borrow to pay for things that are important to them, and to repay loans over time.
>
> *"It is obvious that China's rapid development will be facilitated by banking institutions that are both innovative and responsible," Mr. Weaver said. "Access to credit will help increasingly affluent Chinese consumers achieve their dreams and will also help China expand its economy further."*

25

56.     Defendants' press release of April 16, 2004 provided investors with a false
and misleading account of what the Chinese could expect from MBNA's entry into the
consumer credit market in China. The suggestion that MBNA could facilitate China's
rapid development was misleading, since MBNA concealed the fact that it was
experiencing difficulties managing its US credit card operations, as evidenced by the $1
billion decline in securitizations during the second half of 2003. Foreign regulators were
also now asking questions about MBNA credit card operations, with UK regulators
pointing to concerns about "MBNA policies on default charges, the fees banks assess on
late, overlimit or returned checks."

57.     On April 22, 2004, defendants issued a press release entitled, "MBNA
Reports 21% Increase in Earnings Per Common Share; 2.5 Million New Accounts
Added." The press release stated in part:

> MBNA Corporation announced today that net income for the first quarter
> of 2004 rose to $519.7 million or $.40 per common share, an increase of
> 21%, compared with $432.5 million or $.33 per common share for the first
> quarter of 2003.
>
> *Loan receivables at March 31, 2004 were $30.1 billion, an increase of*
> *$2.7 billion over the first quarter of 2003. Total managed loans at*
> *March 31, 2004 were $117.6 billion, an increase of $11.5 billion or 11%*
> *over the first quarter of 2003. Retail sales and cash advance volume*
> *increased 15% over the first quarter of 2003.*
>
> The Corporation added 2.5 million new accounts during the first quarter
> of 2004. The characteristics of new cardholders are consistent with the
> quality of the Corporation's existing cardholders. New endorsements
> acquired in the first quarter of 2004 include A.G. Edwards & Sons, The
> Timberland Company, National Fish and Wildlife Foundation, Reserve
> Officers Association of the U.S., American Nurses Association of
> California, Scarborough Building Society (U.K.), Rotary International
> (Spain), Viajes Marsans (Spain), Canadian Parks and Wilderness Society
> (CPAWS), and Universite de Laval (Canada). The Corporation also
> renewed a number of group contracts during the first quarter of 2004,
> including American College of Physicians, Golf Digest, American Society

of Civil Engineers, St. Louis Cardinals, National Lawyers Association, Pennsylvania State Nurses Association, and Johns Hopkins Alumni Association.

Losses on loan receivables and managed loans for the first quarter of 2004 were 4.45% and 4.99%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on the loan receivables and managed loans was 3.39% and 4.27%, respectively, at March 31, 2004.

\*\*\*

58.     The press release of April 22, 2004 was false and misleading for the following reasons. First, defendants again presented illusory growth in loan receivables, this time by comparing loan receivables at the end of 1Q04 with loan receivables at the end of 1Q03, to report a modest 9.5% increase, or $2.7 billion. However, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12 month period ending on March 31, 2004. Had defendants compared loan receivables versus the previous quarter ending on December 31, 2003, *defendants would have shocked investors, by reporting that loan receivables plummeted 10.4% or $3.5 billion versus 4Q03.* Incredibly, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

59.     As already stated, MBNA securitization note issuance during the second half of 2004 *dropped $3 billion or 60%, in comparison with the first half of 2003.* (MBNA's SEC Form 10Q issued on November 14, 2003.)  Since MBNA securitization note issuance is driven by prior growth in loan receivables, the drop in securitizations points to the significant contraction in loan receivables during 1Q04. Nevertheless, defendants signaled to investors that the business was growing rapidly, through the addition of 2.5 million new accounts during the quarter, as an alternative and misleading

27

measure of receivables growth. Thus, defendants' illusory presentation of significant growth for 1Q04 actually concealed a significant contraction in loan receivables, information that investors needed to make prudent judgments about the progress and future prospects of MBNA's business.

60. On July 22, 2004, defendants reported results for the quarter ending June 30, 2004, in a press release entitled, "MBNA Reports 21% Increase in Earnings Per Common Share." The press release stated in part:

WILMINGTON, Del., Jul. 22 /PRNewswire-FirstCall/ -- MBNA Corporation (NYSE: KRB) announced today that net income for the second quarter of 2004 rose to $660.3 million or $.51 per common share, an increase of 21%, compared with $543.3 million or $.42 per common share for the second quarter of 2003.

For the first six months of this year, net income rose to $1.180 billion or $.90 per common share, an increase of 20% compared to $975.9 million or $.75 per common share for the first six months of 2003.

"We are pleased with our results so far this year, particularly in the areas of credit quality, fee income growth, and our continued investment in additional business development opportunities," said Bruce L. Hammonds, CEO of MBNA Corporation. "We completed the expansion of our operating platform for our international business this quarter; we are preparing for the anticipated launch of our American Express-branded credit card; and we are expanding our new business lines of professional practice financing and insurance premium financing."

*Loan receivables at June 30, 2004 were $30.5 billion, an increase of $1.2 billion over the second quarter of 2003. Total managed loans at June 30, 2004 were $118.2 billion, an increase of $7.7 billion or 7.0% over the second quarter of 2003. In June, loan receivables increased $1.1 billion and total managed loans increased $1.2 billion. During the quarter, retail sales and cash advance volume increased 15% over the second quarter of 2003.*

The Corporation added 2.5 million new accounts during the second quarter of 2004. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. New endorsements acquired in the second quarter of 2004 include Massachusetts Institute of Technology, Southern Methodist University,

Churchill Downs, Arsenal Football Club (U.K.), Reader's Digest Canada, and Special Olympics Espana. The Corporation also renewed a number of group contracts during the second quarter of 2004, including National Society of Professional Engineers, Chicago Cubs, Florida Nurses Association, Air Force Academy, and Minnesota Dental Association.

Losses on loan receivables and managed loans for the second quarter of 2004 were 4.60% and 4.95%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.48% and 4.08%, respectively, at June 30, 2004.

During the second quarter, the Corporation's financial statements were impacted by several items. Based on improving asset quality trends, the provision for possible credit losses was $94.0 million lower in the second quarter of 2004 than in the second quarter of 2003. The net impact of the change in the interest-only strip receivable reduced securitization income (which is part of other operating income) by $26.8 million for the second quarter of 2004 as compared to a $7.9 million increase for the second quarter of 2003. The Corporation's income tax expense for the second quarter of 2004 was reduced by $32.5 million as a result of the favorable resolution of federal and state examinations.

61.    The press release of July 22, 2004 was false and misleading for the following reasons. First, defendants again presented illusory growth in loan receivables, this time by comparing loan receivables at the end of 2Q04 with loan receivables at the end of 2Q03, to report a modest 4.1% increase, or $1.2 billion. However, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12 month period ending on June 30, 2004. Had defendants compared loan receivables versus the previous quarter ending on March 31, 2004, defendants would have concerned investors, by reporting an astonishingly small increase of 0.1% or $300 million in loan receivables versus 1Q03. Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

62.    Issuance of MBNA securitization notes during the second half of 2004 dropped $3 billion, or 60%, in comparison with the first half of 2003. Since MBNA