# EXHIBIT H

securitization note issuance is driven by prior growth in loan receivables, the drop in securitizations points to the significant contraction in loan receivables during 2Q04. Nevertheless, defendants signaled to investors that the business was growing rapidly, through the addition of 2.5 million new accounts during the quarter, as an alternative and misleading measure of receivables growth. However, the adverse experience of MBNA credit card users, from a time prior to the beginning of the Class Period, coupled the continued flatness of loan receivables strongly infers that account retention was a growing problem for MBNA.

63.    Finally, defendants included in their discussion of results the fact that income derived from its IO strip receivable had dropped as much as $26.8 million during the second quarter of 2004. Given the way false and misleading way defendants continued to report quarterly positive growth in loan receivables, investors would be hard-pressed to see any connection between the true decline in receivables and the drop in IO strip receivable income. Thus, defendants' illusory presentation of significant growth for 2Q04 actually concealed a significant contraction in loan receivables, information that investors needed to make prudent judgments about the progress and future prospects of MBNA's business.

64.    On October 21, 2004, defendants issued a press release entitled, "MBNA Reports Record Third Quarter Earnings" The press release stated in part:

> WILMINGTON, Del., Oct. 21 /PRNewswire-FirstCall/ -- MBNA Corporation announced today that net income for the third quarter of 2004 rose to $728.3 million or $.56 per common share, an increase of 10%, compared with $658.8 million or $.51 per common share for the third quarter of 2003. For the first nine months of this year, net income rose to $1.908 billion or $1.46 per common share, an increase of 17% compared to $1.635 billion or $1.25 per common share for the first nine months of 2003.

30

"MBNA has implemented a wide range of strategic initiatives in 2004 further positioning ourselves for the future," said Bruce Hammonds, President and Chief Executive Officer of MBNA Corporation. "These initiatives include our preparations to issue MBNA American Express credit cards in the next few weeks, the acquisitions of several companies that open new lines of business for us, and the launch of terrific rewards programs with several key affinity partners."

*Loan receivables at September 30, 2004 were $32.1 billion, an increase of $3.3 billion or 11.5% over the third quarter of 2003. Total managed loans at September 30, 2004 were $117.8 billion, an increase of $5.1 billion or 4.5% over the third quarter of 2003.*

The Corporation added 2.3 million new accounts during the third quarter of 2004. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. New endorsements acquired in the third quarter of 2004 include the Philadelphia Phillies, Starwood Hotels & Resort (Canada), Athabasca University (Canada), Ipswich Town Football Club (UK), Manchester City Football Club (UK), and Circulo de Lectores (Spain).

The Corporation also renewed a number of group contracts during the third quarter of 2004, including the National Trust for Historic Preservation, American College of Emergency Physicians, Santa Clara University, Virginia Nurses Association, American Association of University Professors, University of Liverpool (UK), and the Association of International Cancer Research (UK).

Losses on loan receivables and managed loans for the third quarter of 2004 were 4.28% and 4.61%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.45% and 4.11%, respectively, at September 30, 2004. Based on improving asset quality trends, the provision for possible credit losses was $60.7 million lower in the third quarter of 2004 than in the third quarter of 2003.

65.     The press release of October 21, 2004 was false and misleading for the following reasons. First, defendants again presented yet another account of illusory growth in loan receivables, this time by comparing loan receivables at the end of 3Q04 with loan receivables at the end of 3Q03, to report an 11.5% increase, or $3.3 billion. Again, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12 month period ending on

31

September 30, 2004. Had defendants compared loan receivables versus the previous quarter ending on June 30, 2004, defendants would have further perplexed investors, by reporting much smaller increase, of only 5.2% or $1.6 billion in loan receivables versus 3Q04. Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

66.    Issuance of MBNA securitization notes during the second half of 2004 dropped $3 billion or 60%, when compared with the first half of 2003. Since MBNA securitization note issuance is driven by prior growth in loan receivables, the drop in securitizations would point to the lower rate of increase in loan receivables during 3Q04. Nevertheless, defendants advised to investors that the business was still growing at a rapid pace, through the addition of 2.3 million new accounts during the quarter, as an alternative and misleading measure of "positive" receivables growth.

67.    However, this "new accounts" figure fails to take into account the increasingly adverse experiences of MBNA credit card users, dating back from a time prior to the beginning of the Class Period, coupled with the dramatic rise in "surfing", where customers open the account to access a zero percent rate, then pay it off before the rate changes. Thus, defendant's ongoing concealment of a flattening of loan receivables strongly implies that account retention was a growing internal problem for MBNA.

68.    On January 20, 2005, defendants issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.56 Per Common Share - Announces New $2 billion Common Stock Repurchase Program." Promising to increase earnings by decreasing the churn associated with no-interest credit card offerings, in the press release and the earnings conference which

32

followed it the next morning, defendants announced that MBNA had then reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. Defendants also reported a 9% rise in Q4 2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the Q4 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in Q4 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17% and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding shares), indicating defendants felt MBNA's stock was under-priced:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003. For the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003.

> "We grew earnings 15% in a slower industry growth environment and were able to launch several new and exciting programs such as our partnership with American Express and the acquisition of new businesses," said Bruce L. Hammonds, Chief Executive Officer of MBNA Corporation. "We are pleased with the results achieved in 2004."

> In addition, MBNA's Board of Directors has approved an increase of 17% in the quarterly dividend rate to $.14 per common share, which will increase the annual rate to $.56 per common share. MBNA has increased the dividend every year since it became a public company. The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.

> MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to $2 billion of common stock over the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which

utilizes share repurchases to offset the impact of stock-based compensation programs.

MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities.

The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation. "The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives." Some highlights for the year include:

• Hundreds of thousands of Customers activated their American Express-branded cards in the fourth quarter taking advantage of the valuable benefits of an American Express branded card backed by MBNA's top-notch Customer satisfaction.

• Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of receivables growth and introduced a number of value-based products centered upon the WorldPoints rewards platform. MBNA is driving innovative products through its powerful affinity partner distribution network and providing Customers with a wide array of choices, based on their individual needs and interests. Whether Customers choose an NFL Extra Points Visa, a PGA Tour Platinum MasterCard, or one of many professional or alumni programs, MBNA has a credit card to fit each Customer's individual needs and preferences.

• Internationally, MBNA's businesses in the United Kingdom, Canada,

34

and Spain continue to provide additional loan growth opportunities through the same affinity marketing strategy that drove the company's success over the last 20+ years. MBNA has more than 5,000 affinity partners in its U.S. and international businesses.

• MBNA continued to diversify in 2004 with the purchases of Premium Credit Limited (PCL), MBNA's premium financing company in the UK, and Sky Financial, MBNA's professional practice financing business in the U.S.

*Loan receivables at December 31, 2004 were $33.8 billion, an increase of $134.8 million over year-end 2003. Total managed loans at December 31, 2004 were $121.6 billion, an increase of $3.1 billion over year-end 2003.*

Losses on loan receivables and managed loans for the fourth quarter of 2004 were 3.74% and 4.43%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.29% and 4.13%, respectively, at December 31, 2004.

\*\*\*

69.    The press release of January 20, 2005 was false and misleading for the following reasons. Oddly enough, defendants were now faced with the need to compare loan receivables at the end of 4Q04 with loan receivables at the end of 4Q03, reporting a paltry 0.03% increase, or $134.8 million. Defendants were stuck with this deceptive measure, one that was not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for a 12 month period, ending on December 30, 2004. Had defendants compared loan receivables versus the previous quarter ending on September 30, 2004, defendants would surprised investors with an encouraging increase of 5.3% or $1.7 billion in loan receivables versus 3Q04.

70.    Although the worst had past nearly two quarters ago and loan receivables achieved significant quarter over quarter increases in 3Q04 and 4Q04, the charade was not over. Precisely at this time, in connection with the materially false and misleading

35

disclosure of a paltry $134.8 million 4Q04 loan receivables increase, defendants announced their restructuring and share repurchasing programs. In effect, defendants had "queued up" belt tightening and stock support measures to play against a false and misleading picture of worsening business prospects.

71.    On January 21, 2005, Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. Defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to defendants, the program would result in a Q1 2005 charge of $300 million to $350 million but was expected to save $150 million in 2004 and even more in 2006. Set to convince the market that unlike other credit card companies, MBNA would increase earnings by increasing its margins by lowering reliance on the less profitable no-interest card offerings, defendants gave what were essentially pro forma earnings results, backing out their existing no-percent loans:

> Now, we have been running off our zero rate loans, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. If you add that back in, our growth rate would have been 5 percent. The last numbers I saw for the industry through November was 2.5 percent, so we grew at about twice the industry, which is what we normally do.
>
> * * *
>
> The fact that we're running off zero loans means that we don't have to re price as many of our existing customers on the back end ....

72.    Defendants also explained that that the Company's delinquency and loss rates would decrease:

36

Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and as we look out, it would seem to us that delinquency and losses should continue to decrease.

73.     Concerning growth the Company purported to then be experiencing,

defendants said:

We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

* * *

Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

And we feel confident that we will continue to deliver consistent, profitable growth well into the future. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

74.     Although defendants stated "as the year progresses, we expect asset growth to pick up", this belied the fact that asset growth, namely growth in loan receivables, *had already picked up during 4Q04, by a highly significant $1.7 billion.* In fact, looking back at true quarter-to-quarter comparisons during 2004, the Company had experienced a bottom in loan receivables in 1Q04, when they had *plummeted 10.4%, or $3.5 billion versus 4Q03.* Moving on to how the Company would increase earnings by decreasing its reliance on no-interest loans, defendants stated:

Growing profitable loans; let me just discuss with you our zero strategy. It's a place that we are happily diverging from our peers. We obviously were into zero in a big way a few years ago. About 12 to 18 months ago, we saw things happening in this area that we didn't like.

We saw surfing activity increasing, so we saw more and more customers open the account just for zero, and pay it off before the rate changed. The duration on zero moved out. When we started doing zero, we were doing it for a four-month duration. Today, you need to be added 15 months or maybe even life. And we still the marketing disappear.

As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to re price many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and re price those to bring in new customers at zero.

And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.

So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer. Now, this chart shows you why we do that. The line of the top is what happens when you put on a zero rate loan.

You can see the balance billed is much faster, early activation and high balance transfers, but over the long-term, full rate loans balances actually exceed zero, just about at the 9-month mark when we get ready to re price our zero-rate loan. So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.

Now again, like I said earlier, we decreased $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it will normalize. We don't love the impact that that has on our top line, but it is absolutely the right thing to do.

75.    Following the earnings announcement, the New York Times reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial." MBNA's reported Q4 2004 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for the Q4 2004 but guiding expectations down, saying that its own 2005 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves. Shares in Citigroup dropped $0.27 to close at $47.77.

76.    MBNA's report also came a day after competitor Capital One Financial Corp. announced that its Q4 earnings had fallen 27% to $ 195 million. Capital One's per-share earnings, $0.77, were $0.22 short of Wall Street expectations. Capital One attributed its own shortfall to $511 million of expenses for marketing and advertising in the quarter. Capital One CEO and Chairman Richard Fairbank told investors that he

expected such spending to continue throughout 2005, and that similar outlays by the credit cards units of Citigroup Inc. and J.P. Morgan Chase & Co. made it necessary: "I think you are seeing, at least for the three of us, a sort of structural move toward the national-brand game. I don't really see anybody backing down." On this news, Capital One's stock fell by almost 8%, from approximately $83 per share prior to the announcement to below $77 per share in the days following the announcement.

77.    On January 25, 2005, analyst Matthew Park at A.G. Edwards increased his investment rating on MBNA's stock to "buy" from "hold," saying he came away from MBNA's January 21, 2005 earnings conference encouraged about MBNA's future profitability.

78.    Based upon defendants' promises that MBNA's delinquency and losses rates were improving and its extraordinary Q4 2004 results, and buffeted by the increase in MBNA's dividend, the increase in its stock buyback program, anticipated savings from the employee reduction program, and, most of all, the end of its own reliance on zero-interest credit card offerings and the positive net effect that would have on earnings and "Return on Managed Assets" ("ROMA"), MBNA's stock price closed up $0.24 to $27.44 on the NYSE on January 21, 2005.

79.    Having successfully managed both the concealment of the multi-billion dollar contraction in loan receivables during 2004 and a "soft landing" grounded in a lot of talk about a "zero strategy", certain of the Individual Defendants began rapidly selling almost $76 million worth of the Company's stock into the market:

| Date | Defendant | Shares Sold | Price | Gross Proceeds |
|---|---|---|---|---|
| 01/25/2005 | | | | |
| | Rhodes | 406,040 | $26.76 | $10,865,630 |
| | Weaver | 376,835 | $26.76 | $10,084,105 |
| | Krulak | 130,000 | $26.61 | $3,459,300 |
| | Scheflen | 125,810 | $26.85 | $3,377,999 |
| | Vecchione | 79,829 | $26.70 | $2,131,434 |
| | | 20,633 | $26.80 | $552,964 |
| 01/27/2005 | | | | |
| | Cochran | 398,150 | $26.51 | $10,554,957 |
| | | 133,009 | $26.55 | $3,531,389 |
| 01/27/2005 | | | | |
| | Hammonds | 351,409 | $26.51 | $9,315,853 |
| 01/31/2005 | | | | |
| | Krulak | 92,483 | $26.50 | $2,450,800 |
| 02/01/2005 | | | | |
| | Krulak | 224,754 | $26.75 | $6,012,170 |
| | | 50,217 | $27.00 | $1,355,859 |
| 02/03/2005 | | | | |
| | Struthers | 457,464 | $26.84 | $12,278,334 |
| Totals | | 2,846,633 | | $75,970,792 |

80.    On February 9, 2005, defendants appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4 2004 results and future expectations. As they had during the January 21, 2005 earnings conference, defendants

41

displayed the following chart depicting the Company's history of "Consistent, Profitable Growth" at the CSFB conference:



81.    During the conference, defendants admitted that the Company was seeing "slowing growth" in its "core product," credit card interest revenues, but stated that another trend the Company was then experiencing, growing "ROMA" or "Return on Managed Assets," would counter the lack of growth and increase the Company's revenues and earnings:



82.     Defendants stated an increase in ROMA would increase MBNA's earnings:



83.     Based on defendants' statements concerning the financial results and business environment they said MBNA was then experiencing, defendants once again stated MBNA would achieve 12% average annual EPS growth – with 10% in 2005 – and

43

a 20%+ increase on Return of Equity:

**Financial Results**

* 12% Average Annual EPS Growth, 10%* in 2005

* Return on Equity of 20%+

* 10% EPS growth in 2005 excludes previously announced restructuring charge

84.     During the February 9, 2005 CSFB presentation, defendants once again attempted to increase investor confidence by repeating statements made concerning the "Rating Agency Perspective" during the January 21, 2005 earnings conference. Defendants again stated they had "met with and presented both the restructuring plan and stock repurchase program with rating agencies," stating that the rating agencies had "no major concerns." Defendants also stated that the rating agencies "Recognize[d] MBNA's proven ability to increase earnings through a variety of economic and competitive cycles."

85.     Then, on April 21, 2005, MBNA shocked the market, issuing a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." The press release disclosed in relevant part that:

> [N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004 [and $0.59 per share in Q4 2004]. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax [double the $300-$350 million stated on January 21, 2005]. Without the restructuring charge, net income was $514.1 million or $.40 per common share.
>
> In addition to the restructuring charge, the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.

As a result of these recent trends, in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments. This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net loss from securitization activity is included in other operating income and caused the Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004 other operating income.

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card business. "It is a difficult environment right now. However, we've made progress on recent product introductions, diversification strategies, and improvements in credit quality and operating efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

*Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004 [but a decrease from the $33.8 billion at December 31, 2004]. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004 [but a decrease of $5 billion, down from $121.6 billion at December 31, 2004]. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.*

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively [up from 3.74% and 4.43% respectively in the Q4 2004]. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005 [with delinquency on managed loans up from 4.13% in the Q4 2004]. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%.

In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.

\* \* \*

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge includes three major components -- staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

86. The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a) As early as the third quarter of 2003, securitization of credit card receivables was in decline and the decline remained an alarming component of defendants' structured financing activities throughout the Class Period;

(b) The quarterly comparisons defendants engineered to report loan receivable assets was deceptive, since they totally obscured meaningful and important trends in the direction of asset growth of over time;

(c) Loan receivables had contracted several times during the Class Period, with the most severe contraction occurring during the first quarter of 2004, when *loan receivables plummeted 10.4% or $3.5 billion versus 4Q03;*

(d) The addition of millions of new customer accounts in 2004 had not contributed to growth in loan receivables and stood in stark contrast with a contraction in loan receivables during a number of quarterly reporting periods;

(e) That the Company had experienced "unexpectedly high payment volumes from U.S. credit card customers", reducing managed loans and causing loan receivables to decrease by billions of dollars during the Class Period;

(f) Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(g) MBNA had suffered several unseasonably sharp contractions in lending during the Class Period, including a contraction during Q1 2005, causing total managed loans to decrease $5 billion by the end of Q1 2004;

(h) The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(i) MBNA was experiencing higher-than-expected delinquencies during the Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(j) The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(k) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4 2004;

(l) Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(m) Due to the increase in pre-pays, the interest-only securitization strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(n) The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

87.    Following the Company's shocking April 21, 2005 disclosures concerning the true state of its business operations, financial results and 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of

April 20, 2005, to below $19 per share on extremely high trading volume of 51 million shares, representing an astonishing 793% of its 52-week average daily trading volume.

88.    On April 28, 2005, Legg Mason issued an analyst report entitled "Consumer Finance – I/O Strip Issue Appears MBNA-Specific." In its report, Legg Mason stated that "In our view, the weakness at MBNA is more fundamentally-related and company-specific. With [Capital One] already reporting solid 1Q05 results (and no significant I/O strip writedown) and similarly-strong results expected for [Providian Financial Corp.], we doubt either is at risk." Legg Mason also reported that "we believe [Capital One] and [Providian] have taken more conservative approaches to gain on sale recognition in the past, limiting the potential for writedowns on weaker-than-expected trends in the future."

## LOSS CAUSATION/ECONOMIC LOSS

89.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated MBNA's stock price and operated as a fraud or deceit on Class Period purchasers of MBNA stock by misrepresenting the Company's business success and future business prospects.

90.    Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's business prospects. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, MBNA stock fell precipitously as the prior artificial inflation came out of MBNA's stock price. As a result of their purchases of MBNA stock during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

91. During the Class Period, the defendants presented a misleading picture of MBNA's business and prospects. Thus, instead of truthfully disclosing during the Class Period that MBNA's business was not as healthy as represented, defendants caused MBNA to falsely represent the strength of its growth in new loans, delinquency rates, loan loss rates, its ability to wean its sales model off teaser no-interest promotions, the value of its interest-only securitization strips and its forecasted earnings.

92. These false claims of strong future results and the successful culmination of the Company's reliance on no-interest teaser promotional offers caused and maintained the artificial inflation in MBNA's stock price throughout the Class Period until the truth was revealed to the market.

93. Defendants' false and misleading statements had the intended effect and caused MBNA stock to trade at artificially inflated levels throughout the Class Period, permitting insiders to sell almost $76 million worth of in their own MBNA stock and to justify the payment of millions of dollars in bonuses and other incentive compensation to themselves.

94. On April 21, 2005, defendants were forced to publicly disclose that: (i) the Company was experiencing "unexpectedly high" prepayment volume during the Q1 2005; (ii) that during Q1 2005 more of the prepayments were the higher interest, higher revenue portion of its loan portfolio; (iii) that MBNA was suffering from an unseasonably sharp contraction in loans in Q1 2005; (iv) that MBNA was experiencing higher-than-expected delinquency rates during the Q1 2005; (v) that loan losses were increasing; (vi) that the Company had reversed it policy of not offering teaser no-interest promotional cards; (vii) that the value its interest-only securitization strips was overstated

by 16%; and (viii) that the Company's previously announced Q1 2005 restructuring charge had doubled during the quarter to $767.6 million. As investors and the market became aware that MBNA's actual business prospects were poorer than represented, which had been obfuscated by defendants, the prior artificial inflation came out of MBNA's stock price, damaging investors.

95.     As a direct result of defendants' admissions and the public revelations regarding the truth about MBNA's previous representations and its actual business prospects going forward, MBNA's stock price plummeted almost 20%, on unusually high volume, falling from $23.11 on April 20, 2005 to $18.50 per share on April 21, 2005, a one-day drop of $4.61 per share, on 793% of the average daily trading volume. This drop removed the inflation from MBNA's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and MBNA's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of up to $4.61 per share.

96.     The almost 20% decline in MBNA's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of MBNA's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which MBNA's stock price fell almost 20% as a result of defendants' fraud

51

being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate MBNA's stock price and the subsequent significant decline in the value of MBNA's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5

### Against All Defendants

97. Plaintiff incorporates ¶¶96 by reference.

98. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MBNA publicly traded securities during the Class Period.

100. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MBNA publicly traded

securities. Plaintiff and the Class would not have purchased MBNA publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

101. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of MBNA publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act

### Against All Defendants

102. Plaintiff incorporates ¶¶1-101 by reference.

103. The Individual Defendants acted as controlling persons of MBNA within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of MBNA, and their ownership of MBNA stock, the Individual Defendants had the power and authority to cause MBNA to engage in the wrongful conduct complained of herein. MBNA controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and MBNA are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

104. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased MBNA publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants.

53

105. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MBNA had more than 1.27 billion shares of stock outstanding, owned by hundreds if not thousands of persons.

106. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the prices of MBNA's publicly traded securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

107. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

108.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

109.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to FRCP 23;

B. Awarding plaintiff and the members of the Class damages, interest and costs; and

C. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Jeffrey S. Goddess (Del. Bar No. 630)
Rosenthal, Monhait, Gross & Goddess, P.A.
Suite 1401, 919 Market Street
P. O. Box 1070
Wilmington, DE  19899-1070
(302) 656-4433

David R. Scott
Arthur L. Shingler, III
Scott & Scott LLC
Wells Fargo Building
401 B Street, Suite 307
San Diego, CA  92101
(619) 233-4565

Attorneys for Plaintiff

55

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

_Thomas J. Cassen_, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the Complaint and retains Scott + Scott, LLC, and such co-counsel it deems appropriate to associate with, to pursue such action on a contingent fee basis.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's transaction(s) in the MBNA Corp. ("KRB") security that is the subject of this action during the Class Period is/are as follows:

| No of Shares/Securities | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 200 Shares KRB | Buy | 12-2-04 | 27.01 |
| 180 Shares KRB | Buy | 15-12-04 | 27.02 |

5.  During the three years prior to the date of this Certification, Plaintiff has not served, or sought to serve as a class representative in a federal securities fraud case, except as follows:

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 day of ___May___, 2005, at ___Tyler, TX___ (city, state).

Printed Name: _Thomas J Cassen_

Signature: _Thomas J Cassen_

Mailing Address:
(Please print)

Telephone #:

E-mail Address:

**REDACTED**