# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

-----------------------------------------------------------x

LEMON BAY PARTNERS, LLP,

        Plaintiff,

--against--

BRUCE L. HAMMONDS, KENNETH A. VECCHIONE, RICHARD K. STRUTHERS, JOHN R. COCHRAN, III, LANCE L. WEAVER, CHARLES C. KRULAK, MICHAEL G. RHODES, JOHN W. SCHEFLEN, JAMES H. BERICK, MARY M. BOIES, BENJAMIN R. CIVILETTI, WILLIAM L. JEWS, RANDOLPH D. LERNER, STUART L. MARKOWITZ, WILLIAM B. MILSTEAD, LAURA S. UNGER and THOMAS G. MURDOUGH,

        Defendants,

--and--

MBNA CORP.,

        Nominal Defendant.

-----------------------------------------------------------x

No. 05-Civ-327-GMS

**AMENDED SHAREHOLDER'S CLASS AND DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, by its attorneys, submits this shareholder's class and derivative complaint against the defendants named herein. The allegations are asserted on information and belief, except as to those matters which relate to plaintiff and its own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant MBNA Corp. ("MBNA" or the "Company") against its executive officers and

1

directors to recover damages inflicted upon MBNA by their actions in connection with an asserted scheme to mislead the investing public through misrepresentations and omissions of material fact.

2. This action is also brought as a class action against the individual defendants for breach of fiduciary duty:

　　i. on behalf of a class of shareholders who held the shares of MBNA on January 19, 2005, and did not sell their shares as a result of the individual defendants' breaches of fiduciary duty and breach of their duty of candor as alleged herein; and

　　ii. on behalf of a class of MBNA shareholders whose MBNA shares will be exchanged for the merger consideration as discussed below and have been damaged by the wrongs alleged herein wherein they will not received consideration which they would otherwise have received had the breaches of fiduciary duty and the breaches of the duty of candor not occurred.

3. On or about May 5, 2005, MBNA shareholder James M. Baker brought a securities class action lawsuit against MBNA and defendants Hammonds, Vecchione, Struthers, Cochran, Weaver, Krulak, Rhodes, and Scheflen alleging violations of the Securities Exchange Act of 1934. Specifically, the Class Action Complaint alleges that the Company failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:

(a) The Company had been experiencing unexpectedly high payment volumes from U.S. credit card customers during Q1 2005, reducing managed loans in the quarter more than in prior years, and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1 2005 from $33.8 billion reported at the end of

2

Q1 2004;

(b) Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(c) MBNA was suffering from an unseasonably sharp contraction in loans during Q1 2005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1 2004;

(d) The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e) MBNA was experiencing higher-than-expected delinquencies during Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f) The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

(g) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in 4Q 2004;

(h) Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i) Due to the increase in pre-pays, the interest-only securitization strip securities were overvalued on the Company's books; and

(j)   The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

4.   The shareholder Class Action Complaint alleges that as a result of the defendants' false statements and omissions, MBNA's stock traded at artificially high prices during the period January 20, 2005 through April 21, 2005 (the "Class Period"). During the Class Period defendants also caused the Company repurchase $250 million worth of its own stock which supported the stock's high price. Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005.

5.   The Class Action Complaint further alleges that on April 21, 2005, defendants shocked the market by disclosing MBNA had earned only $0.02 cents per share in 1Q 2005 – a 94% decline from the $0.59 per share it reported in Q4 2004-- and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate. Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization declined by over **$5.8 billion** in one trading session.

6.   The Class Action Complaint charges that while MBNA's market price remained at an artificially high level due to defendants' misrepresentations and omissions, defendants took advantage of the price inflation and sold over **$75 million** worth of their own MBNA stock.

4

7. As further set forth below, at all times relevant hereto, defendants Hammonds, Vecchione, Struthers, Cochran, Weaver, Krulak, Rhodes, and Scheflen were among the highest ranking executives of MBNA. Individually and jointly, they were and are in a position to control the affairs of MBNA, including the dissemination of materially false and misleading public statements as charged in the Class Action Complaint.

8  As a consequence of this asserted wrongdoing, MBNA stands to lose many millions of dollars in damages in the class action. Additionally, upon revelation of the omitted material facts, MBNA shares dropped considerably, and the Company thereby lost over $5.8 billion in market value. MBNA will additionally suffer damages through payment of millions of dollars in attorneys' fees and expenses in connection with defending the securities fraud charges set forth in the Class Action Complaint. It would be unfair and inequitable for the shareholders of MBNA to bear the direct or indirect burden to pay these damages caused by the individual defendants, and therefore plaintiff seeks to require the individual defendants to make recompense to the Company.

9. On June 30, 2005, it was announced that the Bank of America would acquire all of the outstanding shares of MBNA in a stock and cash transaction. Each share of MBNA will be exchanged for 0.5009 shares of Bank America stock and $4.125 in cash (the "Merger"). The transaction is worth $26.50 per share to MBNA shareholders as of July 1, 2005. On January 19, 2005 MBNA stock closed at $26.88 per share. On April 21, 2005, MBNA stock closed at $19.16 per share. On June 29, 2005, the day before the announcement of the Merger, MBNA stock closed at $21.07. The wrongdoing of the individual defendants has deprived long-term holders of any true premium for their shares, a detriment not equally shared by all shareholders, as the individual defendants stand to receive benefits from the Merger that are not available to ordinary

public shareholders.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Musick, Peeler & Garrnett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein. This Court also has subject matter jurisdiction over the pendant state law claims asserted herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District.

12. In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate

wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

## PARTIES

13. Plaintiff Lemon Bay Partners LLP, is a Florida limited liability partnership and is an MBNA shareholder. Plaintiff held its MBNA shares before MBNA suffered the damages alleged herein, and continues to hold shares.

14. Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30, 2003, Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Hammonds has been a director of MBNA since 1986. Because of Hammond's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Hammonds sold approximately 340,000 MBNA shares for proceeds of more than $9 million.

15. Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Vecchione is responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. Because of Vecchionne's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects,

7

via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Vecchione sold more than 100,000 MBNA shares for proceeds of over $2.6 million.

16.    Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Struthers is also a director and serves as Chief Loan Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada. In addition, Struthers is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware. Struthers is responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program. Because of Struthers' position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Struthers sold more than 450,000 MBNA shares for proceeds of over $12 million.

17.    Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America. Cochran previously served as the Chief Operating Officer and Chief Marketing Officer of MBNA America. Cochran has been a director of MBNA America since 1986. Because of Cochran's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and

8

employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Cochran sold more than 500,000 MBNA shares for proceeds of $14 million..

18.     Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Weaver is responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Weaver also serves as a board member and former chairman of Mastercard International Inc. Weaver has been a director of MBNA America since 1993. Because of Weaver's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Weaver sold more than 370,000 MBNA shares for proceeds of $10 million.

19.     Defendant Charles C. Krulak ("Krulak") is, and at all times relevant hereto was, Vice Chairman of MBNA and of the Bank. Because of Krulak's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Krulak sold almost 500,000 MBNA shares for proceeds of over $13 million.

20.     Defendant Michael G. Rhodes ("Rhodes") is, and at all times relevant hereto was, Group Executive for the U.S. Credit Card Business Development division of MBNA. Because of

9

Rhodes's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Rhodes sold over 400,000 MBNA shares proceeds of over $10 million.

21. Defendant John W. Seheflen ("Seheflen") is, and at all times relevant hereto was, Vice Chairman of MBNA America and Secretary of MBNA and the Bank. Because of Scheflen's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Scheflen sold over 125,000 MBNA shares for proceeds of almost $3.4 million.

22. Defendant Randolph D. Lemer ("Lerner") is, and at all times relevant hereto was, Chairman of the Board and a director of MBNA. Because of Lemer's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him.

23. Defendant James H. Berick ("Berick") is, and at all times relevant hereto was, a director of MBNA. Because of Berick's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other

10

corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

24.     Defendant Mary M. Boies ("Boies") is, and at all times relevant hereto was, a director of MBNA. Because of Boies' position, she knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.

25.     Defendant Benjamin R. Civiletti ("Civiletti") is, and at all times relevant hereto was, a director of MBNA. Because of Civiletti's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

26.     Defendant William L. Jews ("Jews") is, and at all times relevant hereto was, a director of MBNA. Because of Jews' position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

27.     Defendant Stuart L. Markowitz ("Markowitz") is, and at all times relevant hereto was, a director of MBNA. Because of Markowitz's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future

business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

28. Defendant William B. Milstead ("Milstead") is, and at all times relevant hereto was, a director of MBNA. Because of Milstead's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

29. Defendant Laura S. Unger ("Unger") is, and at all times relevant hereto was, a director of MBNA. Because of Unger's position, she knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.

30. The individuals named as defendants in ¶¶ 14-29 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. The defendants named in paragraphs 14-21 of the Complaint are referred to as the

"Securities Class Action Defendants." Because of their positions and access to material non-public information available to them but not to the public, the Individual Defendants knew or improperly failed to determine that the adverse facts specified herein, as alleged in the Class Action Complaint, had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading. The Class Action Complaint alleges that the Securities Class Action Defendants are liable under the federal securities laws for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Securities Class Action Defendants.

31. Nominal defendant MBNA is a bank holding company and the parent of MBNA America Bank, N.A., a national bank. MBNA America has two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issue credit cards in the United Kingdom, Ireland, Spain, and Canada. The Company is headquartered at 1100 North King Street, Wilmington, Delaware and has over 1.277 billion shares of common stock issued and outstanding. The Company's shares trade on the New York Stock Exchange under the ticker symbol "KRB."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32. As detailed herein, each of the Individual Defendants owed MBNA and its shareholders fiduciary duties, including the duties of loyalty, good faith, candor and due care.

33. To discharge their legal duties, the Individual Defendants were required to exercise reasonable and prudent supervision over, and keep themselves informed of policies, practices, controls and financial affairs, which included, inter alia, taking necessary steps to ensure that adequate policies and reporting systems existed at MBNA and functioned properly to

ensure that relevant rules and regulations under which MBNA operated were followed. Specifically, The Individual Defendants were required, among other things, to:

  a. in good faith, manage, conduct, supervise, and direct the business and affairs of MBNA carefully and prudently, and in accordance with applicable the law;

  b. neither violate nor intentionally or recklessly permit any officer, director, or employee of MBNA to violate applicable federal and state laws, rules and regulations, or any Company rule or regulation;

  c. ensure MBNA had in place reasonable, adequate and effective systems and controls regarding critical business functions;

  d. remain informed as to the status of MBNA operations, and, upon receipt of notice or information of improper practices or actions, to make a reasonable inquiry in connection therewith, and to take steps reasonably necessary to correct such conditions or practices, and make such disclosures as are necessary to comply with applicable federal and state laws;

  e. supervise the preparation, filing, and/or dissemination of any Securities and Exchange Commission ("SEC") filings, press releases, audits, reports, or other information required by law, and to examine and evaluate any audits or other financial information concerning the financial condition of MBNA and to cause them to obey and comply with, and not violate the federal or state securities laws;

  f. refrain from misusing inside information for personal profit; and

  g. insure that disclosures by the Company to the investing public were accurate and complete.

14

34. During the relevant period, the MBNA Audit Committee was composed of defendants Berick, Jews, Markowitz, Milstead, Murdough and Unger. The Audit Committee was charged with the oversight of MBNA management and was responsible to insure that MBNA management caused the Company to comply with applicable laws and regulations and that the Company's disclosures was accurate and complete. The Audit Committee failed to properly monitor and oversee the functions and acts of MBNA management, ignored adverse information available to it, as reflected in the allegations set forth below, and as such these Defendants breached their fiduciary duties owed to MBNA and its shareholders.

## THE SCHEME ASSERTED IN THE SECURITIES CLASS ACTION

35. The allegations in this section summarize the essential allegations of the complaint (the "Class Action Complaint") in Baker v. MBNA Corp. et al., U.S. District Court for the District of Delaware, Docket No. 1:05-CV-00272-GMS (the "Class Action").

36. The Class Period in the Class Action begins on January 20, 2005. On that date, defendants issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.59 Per Common Share - Announces New $2 billion Common Stock Repurchase Program." In the press release and the earnings conference which followed it the next morning, defendants announced that MBNA had reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. Defendants also reported a 9% rise in 4Q 2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the 4Q 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in 4Q 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17%, and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding

15

shares), indicating defendants felt MBNA's stock was under-priced. The January 20, 2005 press release stated in part as follows:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003. For the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003.
>
> * * *
>
> In addition, MBNA's Board of Directors has approved an increase of 17% in the quarterly dividend rate to $.14 per common share, which will increase the annual rate to $.56 per common share. MBNA has increased the dividend every year since it became a public company. The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.
>
> MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to $2 billion of common stock over the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which utilizes share repurchases to offset the impact of stock-based compensation programs.
>
> MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.
>
> The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities. The corporation may incur additional expenses

for the disposition of fixed assets related to this consolidation.

"The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives."

37    On January 21, 2005, defendants Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. Defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to defendants, the program would result in a 1Q '05 charge of $300 million to $350 million but was expected to save $150 million in 2005 and even more in 2006.

38    On the conference call, defendants stated in substance that MBNA would increase earnings by increasing its profit margins. The Company stated that intended to accomplish this by lowering reliance on the less profitable no-interest card offerings:

> Now, we have been running off our zero rate loans, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. If you add that back in, our growth rate would have been 5 percent. The last numbers I saw for the industry through November was 2.5 percent, so we grew at about twice the industry, which is what we normally do.
>
> * * *
>
> The fact that we're running off zero loans means that we don't have to re-price as many of our existing customers on the back end . . . .

39.    On the conference call, defendants also predicted that that the Company's delinquency and loss rates would decrease:

17

Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and as we look out, it would seem to us that delinquency and losses should continue to decrease.

40. Concerning the Company's purported growth, defendants said:

We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

\* \* \*

Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

18

And we feel confident that we will continue to deliver consistent, profitable growth well into the future. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

41. Specifically describing during the conference call how the Company would increase earnings by decreasing its reliance on no-interest loans, defendants stated that MBNA was "moving away from zero [percentage rate promotions] and focusing on replacing these programs with rewards programs. It's better long term profitability, and it's better for the customer." Defendants added that the Company's outstanding zero percent loans would decrease throughout 2004.

42. Following the MBNA earnings announcement and conference call, the New York Times reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial."

43. MBNA's reported 4Q 2004 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for 4Q 2004 but guiding expectations down, saying that its own 2005 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves. Shares in Citigroup dropped $0.27 to close at $47.77.

44. MBNA's report also came a day after competitor Capital One Financial Corp. announced that its 4Q earnings had fallen 27% to $ 195 million, falling short of Wall Street expectations.

45. Based upon defendants' promises that MBNA's delinquency and losses rates were improving, the Company's extraordinary 4Q 2004 results, and defendants' projections for

19