# EXHIBIT K

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD F. BENOIT, Derivatively On Behalf of MBNA CORPORATION,<br><br>                    Plaintiff,<br><br>   vs.<br><br>BRUCE L. HAMMONDS, JOHN R. COCHRAN, III, RICHARD K. STRUTHERS, KENNETH A. VECCHIONE, LANCE L. WEAVER, CHARLES C. KRULAK, MICHAEL G. RHODES, JOHN W. SCHEFLEN, JAMES H. BERICK, MARY M. BOIES, BENJAMIN R. CIVILETTI, WILLIAM L. JEWS, RANDOLPH D. LERNER, STUART L. MARKOWITZ, WILLIAM B. MILSTEAD, LAURA S. UNGER and THOMAS G. MURDOUGH,<br><br>                    Defendants,<br><br>   - and -<br><br>MBNA CORPORATION, a Maryland corporation,<br><br>                    Nominal Defendant. | Case No. 1:05-cv-00361(GMS)<br><br>VERIFIED AMENDED SHAREHOLDER DERIVATIVE AND CLASS COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES AND EXCHANGE ACT OF 1934<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Amended Shareholder and Class Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of MBNA Corporation ("MBNA" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Securities and Exchange Act of 1934 that occurred between January 2005 and the present (the "Relevant Period") and that have caused substantial losses to MBNA and other damages, such as to its reputation and goodwill. Further, defendants refuse to comply with their fiduciary obligations by arranging to squeeze plaintiff and MBNA's public stockholders out of their equity interest in MBNA by selling MBNA to Bank of America Corp. ("Bank of America") for $6.25 in cash for each share of MBNA common stock, allowing defendants to reap vast rewards from the immediate vesting of all outstanding Company stock options and their change in control agreements, while simultaneously concealing material information from the Company's shareholders. This lawsuit is necessary to protect MBNA and its shareholders from the MBNA Board of Directors' (the "Board") continuing breaches of fiduciary duty and conflicts of interest.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3. This court has jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Securities and Exchange Act of 1934.

4. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part

of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to MBNA occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

6. MBNA is an international financial services company providing lending, deposit and credit insurance products and services to its customers. In addition to being the world's largest independent credit-card company, MBNA makes other consumer loans to individuals and commercial loans primarily to small businesses. MBNA is the No. 3 U.S. credit card issuer and the Company, which went public in 1991, had a stock market value of approximately $35 billion at the start of the Relevant Period.

7. At the end of FY:04, U.S. credit card issuers began experiencing a slowdown in new loan origination and fierce competition. With the average American now carrying three credit cards, the days of rapid expansion were over for the industry. Consumers could force – and rapidly were forcing – credit card companies to compete by moving credit card balances from card to card based on which company was offering the best terms. Credit card companies – forced to offer no-interest promotional rates and to increasingly extend the no-interest periods in order to lure in new customers – were seeing their profit margins dwindle. In periods of high competition among card issuers, so-called "teaser" no-interest lending is costly for credit card companies because they incur all of the transactional and capital costs of providing free financing to new borrowers during the teaser period, but many borrowers simply choose to move the balance to another lender offering a competing teaser at the end of the promotional period.

8. MBNA and its executives faced another problem during Q1:05. Shareholder upheaval

surrounded the Company's 2004 annual meeting of shareholders, with large institutional investors demanding increased Board of Directors (the "Board") independence and reductions in the extraordinary executive compensation MBNA's Board had been providing to its top executives. (MBNA's CEO had ranked number one in compensation among all U.S. executives in 2003, receiving $45.5 million.) As a result, certain Board members were replaced with ostensibly "independent" directors in 2004 and, by early January 2005, the Company's Chief Executive Officer's ("CEO") salary had been cut 34% and the salaries of its top five highest executives were cut a combined average of 37%.

9.  However, these same executives were each sitting on tens of millions of dollars worth of stock options and shares of restricted stock which had been granted to them – all of which, defendants knew, would rapidly decline in value if the truth about MBNA's market conditions, business operations and financial prospects came to light. As a result, as MBNA's competitors lowered their guidance for 2005 in light of decreasing credit card revenues and increasing advertising expenses, on January 21, 2005, the start of the Relevant Period, MBNA issued the first earnings forecast in the Company's history, projecting an ongoing 12% earnings *increase* – with a 10% increase in 2005 earnings over 2004's. Defendants said MBNA would make this target because the Company had already drastically reduced its own reliance on insidious no-interest loans, rendering its own loan portfolio more profitable than that of its competitors. Defendants also projected a 20%+ increase in Return on Equity. Defendants' EPS estimate for 2005 was $2.36 per share, which was 10% above the Company's 2004 EPS. These projections were being made nearly one-third of the way into Q1:05 and would be repeated and detailed at the Company's January 21, 2005 and February 9, 2005 investor conferences.

10. Defendants also primed the market by announcing an increase in the Company's dividend to 17% and a $2 billion stock buyback program. Defendants promised "consistent, profitable growth" for MBNA despite the competition in the industry because MBNA would not get sucked into the teaser no-interest rate promotional game.

11. But on April 21, 2005, defendants shocked the market by disclosing MBNA had earned

only $0.02 cents in Q1:05 – a 94% decline from the $0.59 per share it reported in Q4:04 – and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate.

  12. The true facts which were known or should have been known by each of the defendants, but concealed from the investing public during the Relevant Period, were as follows:

    (a) The Company had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during Q1:05, reducing managed loans in the quarter "more than in prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1:05 from $33.8 billion reported at the end of Q1:04;

    (b) Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

    (c) MBNA was suffering from an unseasonably sharp contraction in loans during Q1:05 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1:04;

    (d) The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

    (e) MBNA was experiencing higher-than-expected delinquencies during Q1:05, increasing to 4.17% from 4.13% at the end of Q4:04;

    (f) The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

    (g) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in Q4:04;

    (h) Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

        (i)      Due to the increase in pre-pays, the interest-only securitization strip securities valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

        (j)      The Company's previously announced Q1:05 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

      13.      As a result of the defendants' false statements, MBNA's stock traded at inflated levels during the Relevant Period which permitted the Company's top officers and directors to sell more than $75.9 million worth of their own shares. During the Relevant Period, defendants also caused the Company to repurchase $250 million worth of its own stock at artificially inflated prices. Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005.

      14.      Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's value plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization lost over $5.8 billion in one trading session and its credibility with the investment community has been profoundly damaged.

      15.      Then, on June 30, 2005, the defendants announced that MBNA had entered into an agreement with Bank of America whereby Bank of America would acquire MBNA, thereby insulating themselves from liability in exchange for indemnity from Bank of America for their past deeds and squeezing out plaintiffs and MBNA's other stockholders. Each of the defendants are directly violating or aiding and abetting the other defendants' violations of the fiduciary duties owed to the public shareholders of MBNA. As the directors have unlawfully placed their own interests ahead of MBNA's shareholders, the squeeze out will be consummated resulting in irreparable harm absent judicial intervention.

**THE PARTIES**

16. Plaintiff Donald F. Benoit is, and was at times relevant hereto, an owner and holder of MBNA common stock. Plaintiff is a citizen of Florida.

17. Nominal defendant MBNA is a corporation organized and existing under the laws of the state of Maryland with its headquarters located at 1100 North King Street, Wilmington, Delaware. MBNA is an international financial services company providing lending, deposit, and credit insurance products and services to its customers. In addition to being the world's largest independent credit-card company, MBNA makes other consumer loans to individuals and commercial loans primarily to small businesses. MBNA is the No. 3 U.S. credit card issuer, and the Company, which went public in 1991, had a stock market value of approximately $35 billion at the start of the Relevant Period. MBNA America Bank, N.A. (the "Bank") is the Company's principal subsidiary.

18. Defendant Bruce L. Hammonds ("Hammonds") is, and at all times relevant hereto was, President, CEO and a director of MBNA. Because of Hammonds' positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hammonds participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:04, MBNA paid defendant Hammonds $9,165,947 in salary, bonus and other compensation. During the Relevant Period, Hammonds sold 341,409 shares of MBNA stock for proceeds of $9,315,044.35. Hammonds is a citizen of Delaware.

19. Defendant Randolph D. Lerner ("Lerner") is, and at all times relevant hereto was, Chairman of the Board and a director of MBNA. Because of Lerner's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

During the Relevant Period, Lerner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Lerner $500,000 in salary. Lerner is a citizen of New York.

20. Defendant John R. Cochran, III ("Cochran") is, and at all times relevant hereto was, Chief Operating Officer of MBNA, Chairman, President and CEO of the Bank. Because of Cochran's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Cochran participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Cochran $8,401,696 in salary, bonus and other compensation. Cochran is a citizen of Delaware.

21. Defendant Richard K. Struthers ("Struthers") is, and at all times relevant hereto was, Vice Chairman of MBNA and Vice Chairman of International and Consumer Lending for the Bank. Because of Struthers' positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Struthers participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Struthers $6,191,403 in salary, bonus and other compensation. During the Relevant Period, Struthers sold 457,464 shares of MBNA stock for proceeds of $12,277,922.04. Struthers is a citizen of Maryland.

22. Defendant Kenneth A. Vecchione ("Vecchione") is, and at all times relevant hereto was, Vice Chairman and Chief Financial Officer ("CFO") of MBNA and of the Bank. Because of Vecchione's positions, he knew the adverse non public information about the business of MBNA, as

well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Vecchione participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Vecchione $4,947,108 in salary, bonus and other compensation. During the Relevant Period, Vecchione sold 100,462 shares of MBNA stock for proceeds of $2,684,398.70. Vecchione is a citizen of Delaware.

23. Defendant Lance L. Weaver ("Weaver") is, and at all times relevant hereto was, Vice Chairman of MBNA and Vice Chairman of U.S. Credit Card of the Bank. Because of Weaver's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Weaver participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Weaver $6,191,403 in salary, bonus and other compensation. During the Relevant Period, Weaver sold 376,835 shares of MBNA stock for proceeds of $10,085,574.26. Weaver is a citizen of Delaware.

24. Defendant Charles C. Krulak ("Krulak") is, and at all times relevant hereto was, Vice Chairman of MBNA and of the Bank. Because of Krulak's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Krulak participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Krulak sold 497,454 shares

of MBNA stock for proceeds of $13,278,375.00. Krulak is a citizen of Delaware.

25. Defendant Michael G. Rhodes ("Rhodes") is, and at all times relevant hereto was, Group Executive for the U.S. Credit Card Business Development division of MBNA. Because of Rhodes's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Rhodes participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Rhodes sold 406,040 shares of MBNA stock for proceeds of $10,865,346.17. Rhodes is a citizen of Delaware.

26. Defendant John W. Scheflen ("Scheflen") is, and at all times relevant hereto was, Vice Chairman of MBNA America and Secretary of MBNA and the Bank. Because of Scheflen's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Scheflen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Scheflen sold 125,810 shares of MBNA stock for proceeds of $3,377,998.50. Scheflen is a citizen of Delaware.

27. Defendant James H. Berick ("Berick") is, and at all times relevant hereto was, a director of MBNA. Because of Berick's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Berick participated

in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Berick is a citizen of Ohio.

28. Defendant Mary M. Boies ("Boies") is, and at all times relevant hereto was, a director of MBNA. Because of Boies' position, she knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Boies participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Boies is a citizen of New York.

29. Defendant Benjamin R. Civiletti ("Civiletti") is, and at all times relevant hereto was, a director of MBNA. Because of Civiletti's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Civiletti participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Civiletti is a citizen of Maryland.

30. Defendant William L. Jews ("Jews") is, and at all times relevant hereto was, a director of MBNA. Because of Jews' position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Jews participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Jews is a citizen of Maryland.

31. Defendant Stuart L. Markowitz ("Markowitz") is, and at all times relevant hereto was,

a director of MBNA. Because of Markowitz's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Markowitz participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Markowitz is a citizen of Ohio.

32.  Defendant William B. Milstead ("Milstead") is, and at all times relevant hereto was, a director of MBNA. Because of Milstead's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Milstead participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Milstead is a citizen of South Carolina.

33.  Defendant Laura S. Unger ("Unger") is, and at all times relevant hereto was, a director of MBNA. Because of Unger's position, she knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Unger participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Unger is a citizen of Pennsylvania.

34.  Defendant Thomas G. Murdough ("Murdough") was a director of MBNA at all times relevant hereto, until May 2005. Because of Murdough's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with

other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Murdough participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Murdough is a citizen of Ohio.

35. The defendants identified in ¶¶18, 19, 27-34 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18-26 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶18, 21-26 are referred to herein as the "Insider Selling Defendants." The defendants identified in ¶¶18,19, 27-33 are referred to herein as the "Current Director Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

36. By reason of their positions as officers, directors and/or fiduciaries of MBNA and because of their ability to control the business and corporate affairs of MBNA, the Individual Defendants owed MBNA and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage MBNA in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MBNA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

37. Each director and officer of the Company owes to MBNA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

38. The Individual Defendants, because of their positions of control and authority as directors and/or officers of MBNA, were able to and did, directly and/or indirectly, exercise control

over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with MBNA, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of MBNA.

39. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MBNA, and was at all times acting within the course and scope of such agency.

40. To discharge their duties, the officers and directors of MBNA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of MBNA were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) remain informed as to how MBNA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MBNA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of MBNA's Board during the Relevant Period.

42.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, MBNA has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending MBNA and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

43.     Moreover, these actions have irreparably damaged MBNA's corporate image and goodwill. For at least the foreseeable future, MBNA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and

have misled the investing public, such that MBNA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DUTIES OF THE CURRENT DIRECTOR DEFENDANTS

44. In accordance with their duties of loyalty, care and good faith, the Current Director Defendants, as directors and/or officers of MBNA, are obligated to refrain from:

(a) Participating in any transaction where the directors' or officers' loyalties are divided;

(b) Participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c) Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

45. Plaintiff alleges herein that the Current Director Defendants, separately and together, in connection with the sale of MBNA, violated the fiduciary duties owed to plaintiff and the other public shareholders of MBNA, including their duties of loyalty, good faith and independence, insofar as they stood on both sides of the transaction and engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits not shared equally by plaintiff or the Class.

46. Because the Individual Defendants have breached their duties of loyalty, good faith and independence in connection with the sale of MBNA, the burden of proving the inherent or entire fairness of the Acquisition, including all aspects of its negotiation and structure, is placed upon the Individual Defendants as a matter of law.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

48. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at MBNA and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of MBNA, regarding the Individual Defendants' management of MBNA's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

49. The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 2005 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that MBNA was misrepresenting its financial results. In addition, defendants also made other specific, false statements about MBNA's financial performance and future business prospects, as alleged herein.

50. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of MBNA common stock so they could: (i) dispose of over $75.9 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

51. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

52. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

53. Having been run by a closely knit group of officers and directors, MBNA's executives grew all too accustomed over the years to receiving absurd levels of executive compensation. During 2001 to 2003, the Company's top five most highly paid officers alone received well over $60 million in cash compensation – not counting the tens of thousands of stock options and shares of restricted stock they also received:

| Defendant | Salary | Bonus | Total Cash Compensation |
|---|---|---|---|
| Hammonds | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Cochran | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Weaver | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Struthers | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Vecchione | | | |
| 2003 | $1.6 M | $1.4 M | $2.7 M |
| 2002 | $1.5 M | $1.6 M | $3.1 M |
| 2001 | not disclosed | not disclosed | not disclosed |

54. As reported by the *Philadelphia Inquirer* on April 25, 2005, it had become an old joke in Wilmington that the "initials in MBNA, the credit-card lender once known as Maryland Bank,

National Association, also stood for 'Mothers, Brothers, Nephews and Aunts.'" In fact, under founder Charles M. Cawley ("Cawley"), MBNA had developed a "penchant" for hiring via friendship, blood and marriage – including Cawley's own relatives and in-laws. MBNA's recent proxy statement filed with the SEC on March 15, 2005 reveals the names and cash compensation of 15 employees who are related to senior managers whom Cawley hired. According to the *Philadelphia Inquirer* article:

> Among others, MBNA employs:
>
> Two brothers, three brothers-in-law and a sister-in-law of John R. Cochran, MBNA's chief operating officer. Cochran collected $18 million in cash, stock grants and options profit last year. His brothers, at $370,000 and $293,000, make more than any of his four MBNA-employee in-laws, whose pay ranged from $92,000 to $175,000.
>
> Two brothers and a brother-in-law of vice chairman Lance L. Weaver. Weaver collected $11 million. His family members' pay ranged from $952,000 for Todd Weaver, head of MBNA's Western Regional Office, to a comparatively modest $63,428 for Drew Weaver.
>
> Since Cawley retired from active management at the end of 2003, his own relatives on the MBNA payroll weren't listed, bank spokesman Jim Donahue said. However, Cawley himself is on the list: He's named as "father-in-law of Michael G. Rhodes," the current group executive for U.S. credit card business development.
>
> Cawley, who made hundreds of millions of dollars from MBNA stock options during his long tenure, has remained senior adviser to the company. He collected $2.5 million in cash for his services in 2004. The company said he will retire from that position in August.

55. The Company's Board lacked independence as well. In early 2004, the Board consisted of the following nine directors:

- ***James H. Berick, Esq.***: Retired Partner, Squire, Sanders & Dempsey L.L.P. (successor to Berick, Pearlman & Mills Co., L.P.A., of which Mr. Berick was Chairman from July 1986 until January 2000), a law firm which received substantial compensation for legal services provided to the Company. Berick's son is a partner at Squire, Sanders & Dempsey. Berick has ties to the Lerner family going back decades. He was Al Lerner's college roommate and is godfather to Randolph Lerner, who became MBNA's Chairman after his father's death. A member of MBNA's Board since 1991, he was the Lerner family's lawyer and he still provides advice to the Lerner family. He is also a director of the Town and Country Trust, a real estate investment trust with longstanding ties to the Lerner family.

- ***Benjamin R. Civiletti, Esq.***: Chairman, Venable LLP, a law firm which has received substantial compensation for legal services provided to the Company. One of Civiletti's sons, also a lawyer, is employed in MBNA's legal department.

- **Bruce L. Hammonds**: President and CEO of MBNA.