# EXHIBIT K

- **William L. Jews**.

- **Randolph D. Lerner, Esq.**: Owner of the Cleveland Browns football team. In 1999, the Board approved a 10-year marketing agreement with the Cleveland Browns football team, then owned by Al Lerner and now owned by Randolph D. Lerner, MBNA's Chairman.

- **Stuart L. Markowitz, M.D.**

- **William B. Milstead**: Retired Partner, Ernst & Young LLP, the Company's certified public accountant. Milstead served as the coordinating partner for MBNA at the time of its initial public offering in 1991.

- **Norma Lerner**: Widow of Company co-founder Al Lerner.

- **Michael Rosenthal**: Professor of English at New York's Columbia University, Al Lerner's alma mater.

56. James Berick was Chairman of MBNA's Compensation Committee, which decided on the pay for Lerner and co-founder Cawley. Cawley, who retired in December 2003, received total compensation of $45.5 million in 2003, ***putting him at the top of the U.S. list for CEO pay***, according to a 2004 survey by *Bloomberg News*.

57. MBNA came under intense pressure from shareholders in advance of the May 2004 annual meeting of shareholders who argued that the directors had become too cozy with the executives they were supposed to watch over. Preceding the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. As a result, Norma Lerner and Michael Rosenthal were removed from the Company's Board.

58. As a result of the lack of independence on the MBNA Board, MBNA's executives had become accustomed to receiving very heady compensation. In fact, the Company now admits it had previously followed what it describes as "a ***policy*** of providing high levels of compensation." Following the shareholder-led shakeup of the MBNA Board in 2004, the Compensation Committee finally conceded to making significant reductions in executive compensation.

59. By early 2005 the Compensation Committee had approved reductions of salaries, bonuses and equity awards which would result in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly

compensated executive officers.

60. ***As a result of these cuts, at the beginning of the Relevant Period the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving.*** At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which will expire if not exercised by the expiration date. The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. Some of these stock options would have expired in 2005 if not exercised. The Individual Defendants knew the value of these options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

61. Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to senior executives. As a result of the Individual Defendants' concealment of the Company's true operating and financial status, for 2004 the Individual Defendants determined that the Company had "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin." Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004 were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future." As a result, in January 2005 the Compensation Committee awarded a performance bonus to defendant Hammonds equal to 90% of his 2004 salary (as reduced in August 2004) and awarded bonuses to defendants Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries (as reduced in August 2004). Based on the Company's purportedly stellar performance, the Individual Defendants bequeathed the Company's top five highest-paid executives alone over $200 million worth of performance bonuses and restricted stock awards (which vest 20% per year over five years and

require no payment to exercise):

| Defendant | 2004 Bonus | Value of Restricted Shares Upon Grant | Total 2004 Incentive Compensation Award |
|---|---|---|---|
| Hammond | $1.083 million | $1.083 million | $2.17 million |
| Cochran | $943,000 | $943,000 | $1.89 million |
| Weaver | $1.962 million | $1.962 million | $3.92 million |
| Struthers | $1.962 million | $1.962 million | $3.92 million |
| Vecchione | $1.569 million | $1.569 million | $3.14 million |

## IMPROPER STATEMENTS

62.  On January 20, 2005, the Individual Defendants caused or allowed MBNA to issue a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.56 Per Common Share." Promising to increase earnings by decreasing the churn associated with no-interest credit card offerings, in the press release and the earnings conference which followed it the next morning, the Individual Defendants announced that MBNA had then reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. The Individual Defendants also reported a 9% rise in 4Q:04 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the 4Q:04 delinquency rate declined to 4.13% of loans outstanding from 4.39% in Q4 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17% and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding shares), indicating the Individual Defendants felt MBNA's stock was under-priced. The press release stated in relevant part:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003. For the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003.
>
> "We grew earnings 15% in a slower industry growth environment and were able to launch several new and exciting programs such as our partnership with American Express and the acquisition of new businesses," said Bruce L. Hammonds, Chief Executive Officer of MBNA Corporation. "We are pleased with the results achieved in 2004."
>
> ***In addition, MBNA's Board of Directors has approved an increase of 17% in the quarterly dividend rate to $.14 per common share, which will increase the annual rate to $.56 per common share.  MBNA has increased the dividend every***

- 21 -

*year since it became a public company.* The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.

MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to $2 billion of common stock over the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which utilizes share repurchases to offset the impact of stock-based compensation programs.

MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

***The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006.*** Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities. The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation.

"The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives." Some highlights for the year include:

- Hundreds of thousands of Customers activated their American Express-branded cards in the fourth quarter taking advantage of the valuable benefits of an American Express branded card backed by MBNA's top-notch Customer satisfaction.

- Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of receivables growth and introduced a number of value-based products centered upon the WorldPoints rewards platform. MBNA is driving innovative products through its powerful affinity partner distribution network and providing Customers with a wide array of choices, based on their individual needs and interests. Whether Customers choose an NFL Extra Points Visa, a PGA Tour Platinum MasterCard, or one of many professional or alumni programs, MBNA has a credit card to fit each Customer's individual needs and preferences.

- Internationally, MBNA's businesses in the United Kingdom, Canada, and Spain continue to provide additional loan growth opportunities through the same affinity marketing strategy that drove the company's success over the last 20+ years. MBNA has more than 5,000 affinity partners in its U.S. and international businesses.

- MBNA continued to diversify in 2004 with the purchases of Premium Credit Limited (PCL), MBNA's premium financing company in the UK, and Sky Financial, MBNA's professional practice financing business in the U.S.

Loan receivables at December 31, 2004 were $33.8 billion, an increase of $134.8 million over year-end 2003. Total managed loans at December 31, 2004 were $121.6 billion, an increase of $3.1 billion over year-end 2003.

Losses on loan receivables and managed loans for the fourth quarter of 2004 were 3.74% and 4.43%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.29% and 4.13%, respectively, at December 31, 2004.

63. On January 21, 2005, defendants Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. These defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to these defendants, the program would result in a Q1:05 charge of $300 million to $350 million **but was expected to save $150 million in 2004 and even more in 2006**.

64. Set to convince the market that unlike other credit card companies, MBNA would increase earnings by increasing its margins by lowering reliance on the less profitable no-interest card offerings, defendant Hammonds gave what were essentially *pro forma* earnings results backing out their existing no-percent loans:

> Now, ***we have been running off our zero rate loans***, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. ***If you add that back in, our growth rate would have been 5 percent***. The last numbers I saw for the industry through November was 2.5 percent, ***so we grew at about twice the industry, which is what we normally do***.
>
> \* \* \*
>
> The fact that ***we're running off zero loans*** means that we don't have to re price as many of our existing customers on the back end ....

65. Defendant Hammonds also explained that the Company's delinquency and loss rates would decrease:

> Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and *as we look out*, it would seem to us that ***delinquency and losses should continue to decrease***.

66. Concerning growth the Company purported to *then* be experiencing, defendant Hammonds said:

> We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.
>
> As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.
>
> \* \* \*
>
> ***Our 2005 EPS is $2.36, a 10% increase over 2004***. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.
>
> Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.
>
> Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.
>
> In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.
>
> ***And we feel confident that we will continue to deliver consistent, profitable growth well into the future***. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

67. Specifically describing how the Company would increase earnings by decreasing its reliance on no-interest loans, these defendant Hammonds stated:

> Growing profitable loans; let me just discuss with you our zero strategy. It's a place that we are happily diverging from our peers. We obviously were into zero in a big way a few years ago. About 12 to 18 months ago, we saw things happening in this area that we didn't like.
>
> We saw surfing activity increasing, so we saw more and more customers open the account just for zero, and pay it off before the rate changed. The duration on zero moved out. When we started doing zero, we were doing it for a four-month duration. Today, you need to be added 15 months or maybe even life. And we still the marketing disappear.
>
> As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to re price many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and re price those to bring in new customers at zero. And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.
>
> ***So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer.***
>
> So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.
>
> Now again, like I said earlier, we decreased $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it will normalize. We don't love the impact that that has on our top line, but it is absolutely the right thing to do.

68. Following the earnings announcement, the *New York Times* reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial."

69. MBNA's reported Q4:04 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for the 4Q:04 but guiding expectations down, saying that its own FY:05 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves.

- 25 -

Shares in Citigroup dropped $0.27 to close at $47.77.

70. MBNA's report also came a day after competitor Capital One Financial Corp. announced that its Q4 earnings had fallen 27% to $ 195 million. Capital One's per-share earnings, $0.77, were $0.22 short of Wall Street expectations. Capital One attributed its own shortfall to $511 million of expenses for marketing and advertising in the quarter. Capital One CEO and Chairman Richard Fairbank told investors that he expected such spending to continue throughout 2005, and that similar outlays by the credit cards units of Citigroup Inc. and J.P. Morgan Chase & Co. made it necessary: "I think you are seeing, at least for the three of us, a sort of structural move toward the national-brand game. I don't really see anybody backing down." ***On this news, Capital One's stock fell by almost 8%, from approximately $83 per share prior to the announcement to below $77 per share in the days following the announcement***.

71. Based upon the Individual Defendants' promises that MBNA's delinquency and losses rates were improving and its extraordinary Q4:04 results, and buffeted by the increase in MBNA's dividend, the increase in its stock buyback program, anticipated savings from the employee reduction program, and, most of all, the end of its own reliance on zero-interest credit card offerings and the positive net effect that would have on earnings and "Return on Managed Assets" ("ROMA"), MBNA's stock price closed up $0.24 to $27.44 on the NYSE on January 21, 2005.

72. On February 9, 2005, the Individual Defendants appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4:04 results and future expectations. During the conference, the Individual Defendants admitted that the Company was seeing "slowing growth" in its "core product," credit card interest revenues, but stated that another trend the Company was then experiencing, growing "ROMA" or "Return on Managed Assets," would counter the lack of growth and increase the Company's revenues and earnings. Based on the Individual Defendants' statements concerning the financial results and business environment they said ***MBNA was then***

*experiencing*, the Individual Defendants once again stated MBNA would achieve 12% average annual EPS growth – with 10% in 2005 – and a 20%+ increase on Return of Equity. Further, defendant Vecchione stated they had "met with and presented both the restructuring plan and stock repurchase program with rating agencies," stating that the rating agencies had "no major concerns." Defendant Vecchione also stated that the rating agencies "[r]ecognize[d] MBNA's proven ability to increase earnings through a variety of economic and competitive cycles."

  73. On April 13, 2005, the Individual Defendants caused or allowed MBNA to issue a press release entitled "MBNA America Bank, N.A. Securitizes $750 Million of Credit Card Receivables from the MBNA Credit Card Master Note Trust." According to the press release, through the MBNA Credit Card Master Note Trust, MBNA would issue $750 million in credit card asset backed notes. "The Class A (2005-1) tranche consists of $750 million fixed rate asset backed notes. The three-year 4.20% Class A (2005-1) notes were priced at 99.97408% to yield 4.246%." According to the press release, the transaction, which was scheduled to close on April 20, 2005, was joint-lead managed by CSFB and JP Morgan and co-managed by Banc of America Securities LLC, Barclays Capital, Citigroup, Merrill Lynch & Co. and Morgan Stanley.

### THE TRUTH IS REVEALED

  74. On April 21, 2005, MBNA's shareholders were shocked when MBNA issued a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." The press release stated in relevant part that:

> [N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004 *[and $0.59 per share in Q4:04]*. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax *[double the $300-$350 million stated on January 21, 2005]*. Without the restructuring charge, net income was $514.1 million or $.40 per common share.
>
> In addition to the restructuring charge, the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The

- 27 -

higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.

As a result of these recent trends, in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments. This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net loss from securitization activity is included in other operating income and caused the Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004 other operating income.

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card business. "It is a difficult environment right now. However, we've made progress on recent product introductions, diversification strategies, and improvements in credit quality and operating efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004 [but a decrease from the $33.8 billion at December 31, 2004]. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004 [down from $121.6 billion at December 31, 2004]. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively *[up from 3.74% and 4.43% respectively in the Q4:04]*. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005 *[with delinquency on managed loans up from 4.13% in the Q4:04]*. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%. ***In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.***

* * *

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge includes three major components -- staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

### REASONS THE STATEMENTS WERE IMPROPER

75. The true facts, which were known or should have been known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a) The Company had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during the Q1:05, reducing managed loans in the quarter "more than in

prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1:05 from $33.8 billion reported at the end of Q1:04;

 (b) Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

 (c) MBNA was suffering from a unseasonably sharp contraction in loans during 1Q:05 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of 1Q:04;

 (d) The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

 (e) MBNA was experiencing higher-than-expected delinquencies during the 1Q:05, increasing to 4.17% from 4.13% at the end of Q4:04;

 (f) The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

 (g) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4:04;

 (h) Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

 (i) Due to the increase in pre-pays, the interest-only securitization strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

>   (j) The Company's previously announced 1Q:05 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

75. Following the Company's shocking April 21, 2005 disclosures concerning the true state of its business operations, financial results and 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume.

76. On April 28, 2005, the Individual Defendants caused the Company to announce that its debt offering would be increased by over one-third – from $500 million to $750 million – significantly increasing the Company's borrowing costs.

77. Also on April 28, 2005, Legg Mason issued an analyst report entitled "Consumer Finance – I/O Strip Issue Appears MBNA-Specific." In its report, Legg Mason stated that: "In our view, the weakness at MBNA is more fundamentally-related and company-specific. With [Capital One] already reporting solid 1Q05 results (and no significant I/O strip writedown) and similarly-strong results expected for [Providian Financial Corp.], we doubt either is at risk." Legg Mason also reported that "we believe [Capital One] and [Providian] have taken more conservative approaches to gain on sale recognition in the past, limiting the potential for writedowns on weaker-than-expected trends in the future."

78. As a result of the Individual Defendants' actions, MBNA's market capitalization has been damaged by over $12.53 billion. Further, the Individual Defendants caused MBNA to buyback a quarter of a billion dollars worth of its own stock at artificially inflated prices. At the same time that the defendants were causing MBNA to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $75,970,088.73 of their personally held stock.

## ILLEGAL INSIDER SELLING

79. While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of MBNA stock:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| Bruce L. Hammonds | 1/27/2005 | 351,409 | $ 26.51 | $ 9,315,044.35 |
| Kenneth A. Vecchione | 1/25/2005 | 79,829 | $ 26.70 | $ 2,131,434.30 |
|  | 1/25/2005 | 20,633 | $ 26.80 | $ 552,964.40 |
|  |  | 100,462 |  | $ 2,684,398.70 |
| Richard K. Struthers | 2/3/2005 | 457,464 | $ 26.84 | $12,277,922.04 |
| Charles C. Krulak | 2/1/2005 | 224,754 | $ 26.75 | $ 6,012,169.50 |
|  | 2/1/2005 | 50,217 | $ 27.00 | $ 1,355,859.00 |
|  | 1/31/2005 | 92,483 | $ 26.50 | $ 2,450,799.50 |
|  | 1/25/2005 | 130,000 | $ 26.61 | $ 3,459,547.00 |
|  |  | 497,454 |  | $13,278,375.00 |
| John R. Cochran, III | 1/27/2005 | 398,150 | $ 26.51 | $10,554,040.76 |
|  | 1/27/2005 | 133,009 | $ 26.55 | $ 3,531,388.95 |
|  |  | 531,159 |  | $14,085,429.71 |
| Michael G. Rhodes | 1/25/2005 | 406,040 | $ 26.76 | $10,865,346.17 |
| Lance L. Weaver | 1/25/2005 | 376,835 | $ 26.76 | $10,085,574.26 |
| John W. Scheflen | 1/25/2005 | 125,810 | $ 26.85 | $ 3,377,998.50 |
| TOTAL |  | 2,846,633 |  | $75,970,088.73 |

## DEFENDANTS AGREE TO SELL THE COMPANY IN EXCHANGE FOR INDEMNIFICATION AND PERSONAL BENEFITS

80. The Current Director Defendants knew that the only way they could escape liability for the damage they, and the former directors and officers of the Company, to whom they remain loyal, inflicted upon MBNA's shareholders during the Relevant Period was to sell the Company, thereby attempting to pull the rug out from beneath this shareholder derivative action.

81. On June 30, 2005, Bank of America issued a press release entitled, "Bank of America to Acquire MBNA; Bank of America to Deliver Unparalleled Convenience and Products for Customers Through Acquisition of Premier Credit Card Company." The press release provided in

relevant part:

> Bank of America Corporation today announced a definitive agreement to acquire MBNA Corporation. The acquisition combines the country's largest domestic bank with a leading provider of credit card and payment products, significantly enhancing Bank of America's product mix and customer reach.
>
> Bank of America will become one of the largest card issuers in the United States, with $143 billion in managed outstanding balances and 40 million active accounts, upon completion of the transaction. Bank of America will add more than 20 million new customer accounts as well as affinity relationships with more than 5,000 partner organizations and financial institutions.
>
> The acquisition dramatically increases the bank's opportunity to deepen customer relationships across the full breadth of the company by delivering innovative deposit, lending and investment products and services to MBNA's customer base.
>
> "Today's announcement is not only about the creation of one of the world's largest card providers. That is compelling in and of itself," said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. "But it's really a much larger story about two companies with complementary strengths. The result will be the country's top retailer of financial services with the size and scale to drive distribution and marketing efficiencies."
>
> The deal is expected to close in the fourth quarter of 2005.
>
> \* \* \*
>
> Bank of America expects to achieve overall expense efficiencies of $850 million after-tax, which would be fully realized in 2007, and anticipates a restructuring charge of $1.25 billion after-tax. Cost reductions will come from a range of sources, including the reduction of 6,000 jobs. Additional savings will be achieved through the elimination of overlapping technology, vendor leverage, and marketing expense.
>
> Upon completion of the acquisition, Bank of America will be one of the leading worldwide payments services companies and issuers of credit, debit, and prepaid cards based on total purchase volume. The deal would today make Bank of America the fourth most profitable company in the world.
>
> "This acquisition makes strategic sense for our combined customers and shareholders. It provides us access to MBNA's attractive portfolio as well as their leading product, service and marketing capabilities," Lewis said. "We can now deepen existing and future customer relationships with differentiated capabilities to exceed customer expectations and grow market share. This merger also provides us with an attractive foothold in Canada, the United Kingdom, Spain and Ireland."
>
> Bruce L. Hammonds, 57, CEO and president of MBNA Corporation, will

become CEO and president of Bank of America Card Services and report to Liam E. McGee, 50, president, Bank of America Global Consumer and Small Business Banking. Hammonds will remain in Wilmington, Del., and be part of Bank of America's Risk & Capital Committee, which guides the company's strategic direction.

"The merger will create one of the largest credit card portfolios and will give the combined company access to new marketing channels, customers, products and opportunities for further expansion," Hammonds said. "Both companies benefit as cross-sell opportunities exist to sell MBNA products to Bank of America customers and Bank of America products to MBNA customers.

82. On July 5, 2005, *bizjournals.com* issued a press release entitled, "MBNA Chief to Gain Up to $125M from BofA Deal." The press release provided in relevant part:

> ***Bruce Hammonds, chief executive of MBNA Corp., will be entitled to more than $125 million if the credit-card company is bought by Bank of America Corp., The Wall Street Journal reports, citing MBNA regulatory filings and a compensation expert.***
>
> \* \* \*
>
> Under the purchase, Hammonds will become chief executive at Bank of America Card Services. He will remain at MBNA headquarters in Delaware and join the bank's risk and capital committee, which guides BofA's strategy.
>
> According to the Journal, Hammonds, 57, has eliminated lavish corporate perks that had drawn criticism from corporate-governance advocates.
>
> For years, MBNA doled out large amounts of restricted stock to its top executives, including Hammonds, who was part of the management team that founded the company in the 1980s. The stock awards had a 10-year vesting period and contained a clause to permit immediate vesting in the event of a change of control.
>
> Since becoming CEO at the end of 2003, Hammonds has reduced the granting of restricted stock and options. Last year, he collected total cash compensation of $3.5 million, including $2.5 million in salary and a $1 million bonus. That was down from $4.6 million in 2003, the newspaper says.
>
> BofA says the acquisition of MBNA will allow it to save $850 million in expenses by 2007 via measures that include cutting 6,000 jobs and eliminating overlapping technology and marketing costs. Together, the companies have 200,000 employees.
>
> BofA, which says the deal was put together in only a week, will take a $1.25 billion after-tax charge against earnings for restructuring costs. The bank didn't say when it will take that charge. The deal is expected to close in the fourth quarter.

> The acquisition will make BofA one of the largest credit-card and payment-system companies in the world. BofA says the deal also will make it the fourth-most profitable company in the world. The credit-card division will have 40 million accounts and a 20% market share, BofA Chief Executive Ken Lewis has said.

83. By agreeing to this transaction, the Current Director Defendants are acting to insulate themselves from liability in the ongoing federal securities class actions against MBNA and current shareholder derivative litigation, including this action. In order to escape personal liability for their actions and those of their fellow Individual Defendants, the Current Director Defendants negotiated the sale of MBNA to Bank of America on unfair terms.

84. The Current Director Defendants, structured the entire sale process to ensure that they would (i) obtain indemnification for their prior misdeeds; (ii) retain their positions with the surviving Company and the benefits flowing therefrom; (iii) attempt to circumvent this derivative action by depriving current shareholders of MBNA standing to bring a lawsuit against the Individual Defendants in the surviving corporation; and (iv) personally benefit as a result of the transaction. In exchange for these direct and collateral benefits, the Individual Defendants agreed to sell MBNA via an unfair process and at an unfair price.

## CLASS ACTION ALLEGATIONS

85. Plaintiff brings this action on behalf of himself and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all holders of MBNA stock who are being, and will be harmed, by the Current Director Defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

86. This action is properly maintainable as a class action.

87. The Class is so numerous that joinder of all members is impracticable. According to MBNA's SEC filings, there were nearly 163 million shares of MBNA common stock outstanding.

88. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a) Whether the Current Director Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the acquisition;

(b) Whether the Current Director Defendants are engaging in self-dealing in connection with the acquisition;

(c) Whether the Current Director Defendants have breached their fiduciary duties in failing to maximize shareholder value in connection with the acquisition;

(d) Whether the Current Director Defendants are unjustly enriching themselves and other insiders or affiliates of MBNA through the acquisition;

(e) Whether the Current Director Defendants have breached any of their other fiduciary duties to plaintiffs and the other members of the Class in connection with the acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(f) Whether the Current Director Defendants in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(g) Whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

89. Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff doed not have any interests adverse to the Class.

90. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

91. The prosecution of separate actions by individual members of the Class would create

the following reasons:

(a) As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, defendant Hammonds sold 351,409 shares of MBNA stock for proceeds of $9,315,044.35. Because defendant Hammonds received a personal financial benefit from the challenged insider trading transactions, he is interested and any demand upon him would have been futile;

(b) The principal professional occupation of defendant Hammonds is his employment with MBNA, pursuant to which he received and continues to receive substantial monetary compensations and other benefits as MBNA's President and CEO. Specifically, for FY:04, MBNA paid defendant Hammonds $9,165,947 in salary, bonus and other compensation. Accordingly, defendant Hammonds lacks independence from defendants Milstead, Berick, Boies, Civiletti, Jews and Markowitz, defendants who are not disinterested and/or independent and who exert influence over defendant Hammonds' compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee reviews and approves corporate goals and objectives relevant to the CEO's compensation, evaluates the CEO's performance in light of those goals and objectives, and either as a committee or together with the other independent directors (as directed by the Board), determines and approves the CEO's compensation based on this evaluation. This lack of independence rendered defendant Hammonds incapable of impartially considering a demand to commence and vigorously prosecute this action;

(c) The principal professional occupation of defendant Lerner is his employment with MBNA, pursuant to which he received and continues to receive substantial monetary