581kima

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SCOTT KIMBALL, et al.,

4                  Plaintiffs,

5           v.                        05 Civ. 4725

6   MBNA CORP., et al.,

7                  Defendants.

8   ------------------------------x

9                                     New York, N.Y.
                                      August 29, 2005
10                                    11:25 a.m.

11  Before:

12                   HON. KENNETH M. KARAS,

13                                       District Judge

14                      APPEARANCES

15  CURTIS V. TRINKO
        Attorney for plaintiffs Kimball and McMath
16
    MILBERG WEISS
17      Attorneys for lead plaintiffs
    BY:  ANDREI V. RADO
18
    SULLIVAN & CROMWELL
19      Attorneys for defendants
    BY:  RICHARD C. PEPPERMAN II
20

21

22

23

24

25

581kima

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SCOTT KIMBALL, et al.,

4                Plaintiffs,

5           v.                          05 Civ. 4725

6  MBNA CORP., et al.,

7                Defendants.

8  ------------------------------x

9                                       New York, N.Y.
                                        August 29, 2005
10                                      11:25 a.m.

11 Before:

12                    HON. KENNETH M. KARAS,

13                                       District Judge

14                        APPEARANCES

15 CURTIS V. TRINKO
        Attorney for plaintiffs Kimball and McMath
16
   MILBERG WEISS
17      Attorneys for lead plaintiffs
   BY:  ANDREI V. RADO
18
   SULLIVAN & CROMWELL
19      Attorneys for defendants
   BY:  RICHARD C. PEPPERMAN II
20

21

22

23

24

25

581kima

1

2              (Case called)

3          THE COURT:  First my apologies for my tardiness.  As

4    Ms. Hess, knows, we had a longer than expected discovery spat

5    that I thought would be over in an hour, but I guess I should

6    have known better.

7              We are here on argument in connection with defendants'

8    motion to transfer this case down to the District of Delaware.

9    I have received defendants' memo of law in support of its

10   motion, along with its attachments, I think almost exclusively

11   the complaints filed in Delaware.  I have plaintiffs' response,

12   defendants' reply memorandum, and then I have an August 25

13   letter from you, Mr. Rado, on behalf of your clients,

14   expressing your view that the case should be transferred to

15   Delaware.

16              Am I missing anything?

17          MR. PEPPERMAN:  Not to my knowledge, your Honor.

18          THE COURT:  Mr. Pepperman, you are going to argue the

19   motion?

20          MR. PEPPERMAN:  Sure.  I will keep it very brief, your

21   Honor.  Rick Pepperman on behalf of the defendants.  I will

22   start with something that I hope everyone can agree with, which

23   is that it makes absolutely no sense to have duelling class

24   actions here proceeding in two different federal courts.  The

25   plaintiffs in the two actions in this court do not dispute that

581kima

1    the class they have alleged and the claims they have asserted

2    are essentially identical to the proposed classes and claims in

3    the class actions pending in Delaware.  Obviously there can be

4    only one certified class of MBNA shareholders asserting the

5    claims asserted here against MBA and the individual defendants.

6    In the current situation, the District of Delaware is the only

7    court where all the pending cases can be consolidated.  The

8    unopposed lead plaintiff and lead counsel support transfer of

9    the actions in this court to Delaware and agree that Delaware

10   is the most convenient and appropriate forum for these cases.

11        Also, as we noted in our reply, still today there is

12   no motion pending in Delaware to transfer those cases up to

13   this court, and it doesn't appear that there is anyone who is a

14   party to any of the Delaware actions who is going to file such

15   a motion, and indeed, if such a motion was filed under section

16   1404(a), I don't think there would be a basis for transferring

17   the Delaware actions to this court.

18        The District of Delaware has before it seven class

19   actions asserting the same claims on behalf of the same class,

20   including the first filed class action, plus, pending in the

21   District of Delaware are two closely related and now

22   consolidated derivative actions, plus a class action asserting

23   related claims under the ERISA statute.  And also, the District

24   of Delaware is not only the forum where the preponderance of

25   the cases are pending, it is also the most convenient and most

581kima

1  logical forum for these lawsuits, being that that is where the

2  defendant MBNA is headquartered, and in federal securities

3  actions, particularly those under section 10(b), I think there

4  are many cases saying that the focus is on the conduct of the

5  defendant and the alleged fraudulent statements are deemed to

6  have emanated from the company's headquarters.

7          Finally, I have been in the position a number of times

8  where I am representing a defendant and my client does not like

9  the court in which a case is filed, and seeks to make a section

10 1404(a) motion to transfer it to another preferred, more

11 convenient court when there are not other related actions

12 pending in that court.  I will admit in that very different

13 scenario, the court's decision is often very different.  There

14 the defendant does face a fairly heavy burden of convincing the

15 court to transfer the action, and there the plaintiffs' choice

16 of forum is entitled to some weight.  There, again, oftentimes

17 the courts and the parties engage in a fairly searching

18 analysis of who the likely witnesses are, both party witnesses

19 and third-party witnesses, and which forum truly is more

20 convenient to those witnesses, and where are the documents

21 located.  That kind of analysis, your Honor, I submit, is

22 really not needed here under section 1404(a).  It is clearly

23 most convenient to everyone involved -- the judiciary, the

24 parties and the witnesses -- for there to be only one action,

25 with consolidated discovery and a single trial.

581kima

1        THE COURT:  The one thing that did not accompany your

2    papers was any kind of affidavit describing who the witnesses

3    are on behalf of defendants they would be unavailable and why

4    they would be unavailable should the cases proceed here in

5    Southern District of New York.  Are there any nonparty

6    witnesses who would be unavailable should the case proceed

7    here?

8        MR. PEPPERMAN:  I think the nonparty witnesses who may

9    be available and not here may be, as the case proceeds down the

10   road, former employees of MBNA, over which the company no

11   longer exerts control.  Those witnesses would be subject to the

12   compulsory process in the District of Delaware.

13       THE COURT:  If they are within the power of a Delaware

14   court.  If they are living in California, obviously nobody is

15   going to have an ability to compel their testimony.

16       MR. PEPPERMAN:  That is correct, your Honor, although

17   in a case such as this and the statements challenged, those

18   were made by people in the finance department and senior

19   management all of whom are located in the District of Delaware

20   where MBNA is headquartered.  It is not a situation where

21   people, for example, in credit card call-in banks in California

22   or Dallas or Portland, Maine, might be subject to testimony.

23   The case concerns a limited period of time, really the first

24   half of this year, and statements issued in January and

25   February which were made by the most senior members of the

581kima

1    company, all of whom live and work in the District of Delaware.

2             About the point I was making, your Honor, and this is

3    why I was ending on this point, for example, Judge Scheindlin's

4    case, the Geopharma case, where there is only one action

5    pending and the question is whether it should be transferred to

6    the company's headquarters, that being the most convenient

7    forum, there the courts look very carefully at who the

8    witnesses are, party and nonparty.  There, there has been

9    discovery on transfer motions to determine where the

10   documentary evidence is likely to be located.  But here the

11   question is fundamental.  Looking at the language of the

12   statute, for the convenience of the parties and the witnesses

13   and in the interests of justice the district court may transfer

14   an action to any district where it could have been brought.

15   What we are trying to accomplish here is, there are nine class

16   actions brought on behalf of essentially the same proposed

17   class asserting the essentially the same claims.  They make

18   sense to all be in one court, where discovery can proceed in an

19   orderly fashion and all the actions can be consolidated.  That

20   can only happen in the District of Delaware.  So even apart

21   from where the witnesses are located -- and the nonparty

22   witnesses Mr. Trinko refers to are analysts who may have

23   participated in these calls in late January that he needs to

24   have 17 of those analysts testify live at trial I suspect what

25   would happen if their testimony was relevant, as typically

581kima

1    happens in these cases, their deposition is videotaped and the

2    videotape is used at trial.

3        But I think the Judge Scheindlin case is a useful

4    contrast because there I think she says, even in a securities

5    class action, the plaintiffs' choice of forum is entitled to

6    some weight, but it can be overcome if there is a compelling

7    reason to transfer the case to a different forum, and she

8    identified as one of the compelling reasons the Goggins case, I

9    think it is, where a court in this district transferred a case

10   to the district in New Jersey because there were closely

11   related actions pending there.

12       THE COURT:  This case started within weeks of the

13   Delaware actions, at least some of them.  Some came after.

14       MR. TRINKO:  It was filed 11 days after.

15       THE COURT:  So certainly it makes sense to view this

16   differently should the Delaware cases have a fair amount of

17   momentum going.  But they are very close in track.

18       So how does that affect all of this?

19       MR. PEPPERMAN:  I think that fact, if anything,

20   counsels in favor of transfer, because it is a situation where

21   there are seven actions pending in Delaware, there is an

22   unopposed motion to consolidate those actions, and also an

23   unopposed motion to designate Milberg Weiss as lead counsel for

24   the plaintiffs.  I think it is important to transfer the case

25   early on so there can be a single motion to dismiss or single

581kima

1    action.  In other words, the earlier on in the process that

2    transfer occurs, the more efficiency can be achieved by

3    transfer.  In some respects, if the Delaware action were 18

4    months, two years along, there would be less opportunity for

5    efficiency to transfer the case there.  Here, if you were to

6    put aside the case law and pull out a legal pad and chart

7    counsel the way these actions should proceed that are most

8    likely to achieve judicial efficiency and economy, it is most

9    important to have the cases before a single judge and single

10   court so the case can proceed in a logical way and there is

11   minimum duplicative effort.

12           THE COURT:  Thank you, Mr. Pepperman.

13           Mr. Rado, before I turn to Mr. Trinko, one of the

14   things Mr. Pepperman says in his papers is that there are a

15   bunch of New York nonparty witnesses, including analysts,

16   lawyers, the usual plethora of players in these things.  Are

17   you concerned that their unavailability is going to adversely

18   affect the case you intend to bring on behalf of your client?

19           MR. RADO:  We are not, your Honor.  As the court

20   noted, these are the usual players in these types of cases.  A

21   lot of analysts and accounting firms are based here.  We have

22   never had a problem in cases pending in Texas, for example,

23   where Morgan Stanley was the analyst who maybe had relevant

24   information.  We never had a problem with that and don't

25   anticipate it here, especially given the proximity.  I think if

581kima

1    this case remains here it will be very difficult to transfer

2    any securities case out of New York, for the reason that so

3    many analysts are based here and brokerage firms -- this is

4    usually the locus of finance and securities.

5              THE COURT:  Judge Scheindlin says that if it is always

6    where a defendant company resides, the cases will never be

7    here, and the opposite is, if it is always where the analysts

8    reside, the cases will always be here.

9              But I wanted to have you address that point.  You are

10   obviously very experienced counsel and I assumed it was not an

11   issue where if you were opposing the motion you would say

12   something else.

13             Thank you very much.

14             Mr. Trinko, the floor is yours, sir.

15             MR. TRINKO:  Thank you.  May I use the podium, sir?

16             THE COURT:  You may.

17             MR. TRINKO:  Your Honor, as you are aware, there were

18   two complaints filed against MBNA in the southern of district,

19   one on behalf of Scott Kimball, a resident of New Hampshire,

20   another on behalf of Virginia McMath, a resident of New York.

21             I believe that some discussion of the allegations in

22   the complaint are in order, because I think that does pertain

23   to this motion.  The allegation against MBNA's senior officers

24   really begins in 2004, when MBNA's board determined that

25   executive compensation was not in line with the company's

581kima

1   performance and cut the compensation for 2005 and beyond by 37

2   percent for the senior executive officers.

3          Then on January 2005, at the start of the class

4   period, MBNA issues its first earnings forecast, projecting a

5   10 percent increase in 2005 earnings over its already very

6   positive earnings for 2004.  That was an environment where

7   MBNA's competitors were lowering their guidance on credit card

8   revenues and increased ad expenses.  MBNA announced that it was

9   reducing its reliance on no interest teaser promotional lending

10  so its loan portfolio would be more profitable and it was

11  projecting 20 percent increase and return on equity, also a

12  very substantial increase on dividends, a $2 stock buy-back,

13  and promising profitable growth.  As a result of the

14  announcement, one would expect the result to go up.  The 2004

15  stocks were profitable and as a result of the 2005 projections,

16  the compensation committee awarded many top executives very

17  substantial bonuses and restricted stock awards in early

18  January.  They received 80 to 90 percent of their salary as

19  bonus and received between 2.7 million and 5.5 million in stock

20  awards.

21         Moreover, these same executives, including now the top

22  eight executives, realized that their 2005 compensation would

23  be significantly less than their 2004 levels, so they sold

24  approximately $76 million worth of their MBNA stock.  In the

25  period from January 25, 2005, to February 3, 2005, shortly

581kima

1   after the initial announcement was made, the positive

2   announcement on behalf of the company, the stock market

3   perceived the company's statements as being extremely positive.

4   They looked at the fact that delinquency and loss rates were

5   improving and that the results for the fourth quarter and 2004

6   had gone up, and looked at all the positive things that I just

7   said to you, and indicated their assessment that the future was

8   rosy for MBNA.  In fact, an analyst, Matthew Park, from AG

9   Edwards, increased his rating from whole to buy and was

10  encouraged by MBNA's future profitability.  Then, on April 21,

11  2005, MBNA announced instead a much more negative picture.  It

12  says for the first quarter its earnings were 2 cents a share,

13  rather than 40 cents a share that was experienced in the first

14  quarter 2004 and the 59 cents a share that was experienced in

15  the fourth quarter of 2004.  Restructuring charges were

16  virtually double what they had been estimated in January.

17  There were unexpected high prepayment volumes.  The

18  re-evaluation of interest-only strips were creating lower

19  yields and higher costs, and the earnings per share were going

20  to be much less than the 150 percent growth objective.  Total

21  managed loans were decreasing, losses on loan receivables and

22  managed loans were up, and delinquency on loans had increased.

23  However, many of these trends and the company's true facts were

24  known by defendants as of January 21, 2005, because many of

25  them were dealing with the Christmas season and the habits and

581kima

1    patterns of debt that were experienced by customers and

2    consumers as a result of the Christmas season in 2004.  Many of

3    these results were verified but unannounced long before the end

4    of the quarter.

5           Therefore, when one looks at the yields that the

6    company disclosed, including the sharp contraction in loans and

7    other increases in its negative performance, one must say that

8    they also knew that they were aggressively recognizing gains on

9    the sales of their no-interest loan receivables, and they knew

10   that there was a substantial reversal of their strategy.

11   Instead of decreasing reliance on the no-interest teaser

12   promotions, they in fact increased their reliance.

13          THE COURT:  All of this knowledge and all these

14   actions presumably were perpetrated by, allegedly, the

15   individually named defendants and other senior officials at

16   MBNA, right?

17          MR. TRINKO:  Yes, your Honor.

18          THE COURT:  Does that not make the locus of the

19   operative facts, in your actions and those of Delaware,

20   Delaware?  Because that is where you allege the actions would

21   have taken place.  Even if it has ripple effects throughout the

22   world, including analyst recommendations and so forth, the

23   fraud itself that you allege originates and is carried out in

24   Delaware, is it not?

25          MR. TRINKO:  Yes, your Honor, but with regard to my

581kima

1    perspective of how the proof would go in --

2            THE COURT:  OK, I will give you some leeway on that.

3    That is one of the factors -- I have not interrupted you, sir.

4    Please don't interrupt me.

5            It is one of the more important factors that the

6    courts weigh.  It is of course convenience of witnesses, but it

7    is also the locus of operative facts and this is where the

8    facts would have taken place, and the locus argues for Delaware

9    being the center of gravity, does it not?

10           MR. TRINKO:  It is a factor, your Honor.  As we said,

11   the January statements were made.  The April 2005 statements

12   show that these earlier statements were false, and meantime the

13   senior executives received substantial bonuses and sold $76

14   million worth of stock.  These facts we don't believe will be

15   difficult to prove.  A focused document request and depositions

16   of senior executives will prove those facts.

17           THE COURT:  I imagine the defendants are going to have

18   something to say as to how targeted discovery would be, but at

19   the end of the day, what this case does seem to share in common

20   with the other types of class actions involved in 10b-5 fraud

21   is not unique.  It is fraud perpetrated by senior officials of

22   a company in this case located in Delaware, thus making the

23   center of gravity of the case Delaware.  Even if you might call

24   witnesses, in theory, outside of Delaware, what this is going

25   to come down to is whether or not the defendants committed the

581kima

1    fraud that you allege and that fraud that you allege took place

2    originated in Delaware.  Right?

3             MR. TRINKO:  Your Honor, I would acknowledge that, but

4    I think that is only part of what the proof is.  The major

5    issues are the materiality of the statements and the impact of

6    those statements.  Plaintiffs must prove materiality,

7    transaction causation and loss causation, and New York is where

8    the proof of these issues lies, not in Delaware.  So what you

9    are talking about is certain statements that were made, and

10   then followup press releases would show which show those

11   statements to be false, and then certain scienter indications.

12            THE COURT:  Who in New York do you know whose

13   testimony is simply going to be unavailable to you at trial?

14            MR. TRINKO:  If the case proceeded in Delaware, your

15   Honor, the fact is that none of these analysts would

16   necessarily appear voluntarily.

17            THE COURT:  But do you know they won't appear, first

18   of all?

19            MR. TRINKO:  Have I talked to them personally?  No,

20   your Honor.

21            THE COURT:  What about the point that Mr. Rado made

22   that in other cases where you have New York analysts and class

23   actions being brought in locations as far away as Texas, there

24   can be some sort of videotaped deposition used at trial?  Why

25   isn't that available to you in this case should the case be

581kima

1    tried in Delaware?

2           MR. TRINKO:  That obviously is open to us as far as

3    trying the case.  I am not saying it is not.  But in terms of a

4    motion to transfer, you are trying to assemble all the data as

5    to each venue, as to each one that is more convenient and

6    appropriate to the case, we look to New York as having the

7    major analysts following the with company, that the largest

8    holders of the company stock are located here, those entities

9    may be the subject of that because they can show the

10   materiality and impact of what those statements were.  The

11   company's auditors are here, the company's counsel, the

12   company's primary financial adviser is here.  All of those may

13   have substantial testimony to offer with regard to the

14   materiality and the market impact of the statements.

15           THE COURT:  If that's true, would a case ever get

16   transferred from Southern of New York where the plaintiff lived

17   here?

18           MR. TRINKO:  Certainly, where the overall assessment

19   of the evidence proffered at trial would indicate that much of

20   it would be dealing with another forum.

21           THE COURT:  But I don't see how that could be.  You

22   say that materiality matters in this case.  Materiality matters

23   in a lot of these cases, and materiality is determined by what

24   those in the market deem to be material to their investment

25   decisions.  Analysts, a lot of them, many are based here.  It

581kima

1    is not uncommon to have outside auditors, accountants, based in

2    New York.  So the way you have done the balancing in this case,

3    that that ought to outweigh where the locus of the operative

4    facts may be, the cases would always stay in southern of New

5    York.

6           MR. TRINKO:  Your Honor, with regard to the locus of

7    the facts, you have a three-month window.  You have statements

8    made at the beginning and statements at the end which show that

9    the statements at the beginning were false.

10          THE COURT:  Fill in the blank on that.  I have a dozen

11   of those cases on my docket, three months, nine months, six

12   months.  I have some of Mr. Rado's firm.  I think I have

13   another one with S and C.  But that is standard.  When would a

14   case ever get transferred?

15          MR. TRINKO:  Because I think this is a more unique

16   situation.  I don't think people need to spend the next two

17   years going through labyrinths at MBNA headquarters to find

18   that.  I think a surgically prepared document request for the

19   operational reports, the flash reports that are given to senior

20   executives on a weekly basis, and the minutes of the executive

21   committee meetings for that three or four month period and some

22   depositions of Mr. Hammonds and Vecchione would produce the

23   full record that you need for trial.

24          THE COURT:  Let's assume that is true and let's assume

25   for sake of your argument that the materiality question

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

581kima

1   deserves more weight in all this than I think the cases allow.

2   What about Mr. Pepperman's point that while one can take a look

3   at the Geopharma case, what exists in this case that doesn't

4   exist in that case is seven identical lawsuits in the very

5   forum where the locus of operative facts are, in this case

6   Delaware, and how could it possibly be that it is in the

7   interests of justice and the fair administration of justice to

8   have this up here with all the other related cases down in

9   Delaware, and, added to that, that the presumptive lead

10  plaintiff and lead plaintiff's counsel, very experienced

11  counsel, want to go down to Delaware?  How could it be that

12  this is a fair administration of justice to keep this case

13  here?

14           MR. TRINKO:  Just because people decided to file in

15  Delaware is not conclusive of what venue should be deemed

16  appropriate.

17           THE COURT:  In the abstract you may very well be

18  right.  If we were starting at day zero, then maybe, if all the

19  plaintiffs' lawyers got together, they could say, you know

20  what, we could go to Delaware, we could go to New York, and you

21  were at that meeting and you say here is why we have to go to

22  New York, but you deal with the hand you are dealt, and the

23  hand we have here is that there are seven similar actions in

24  Delaware, they got out of the starting gate before this case

25  did, and the presumptive lead plaintiff says let's go to

581kima

 1   Delaware.  How could it be that it is a fair administration of

 2   justice to keep the case here, given this set of circumstances?

 3          MR. TRINKO:  As you know, your Honor, it is not a race

 4   to the courthouse.  That is not the appropriate standard.

 5          THE COURT:  But that language, from a dissent in a

 6   Supreme Court opinion whether a declaratory judgment has been

 7   properly filed, that is not this case.  This a very complex,

 8   substantial securities case.  It is not going to involve

 9   targeted discovery.  It would be lovely if it did but we know

10   it won't.  There will be endless depositions and document

11   production, and there will be in all likelihood innumerable

12   phone conferences with a magistrate judge or district judge on

13   discovery, and I don't see how it makes sense to have this case

14   as an out liar up here given that all the Delaware cases were

15   filed first.  The bottom line here is that it is an eight-horse

16   race and you are the eighth horse.

17          You get my point.

18          MR. TRINKO:  I understand, your Honor.

19          THE COURT:  All the other horses are in Delaware.

20          MR. TRINKO:  But that is only one factor, your Honor.

21   Neither the defendants nor Milberg Weiss have offered a

22   scintilla of support for why a motion to transfer should be

23   granted to go to Delaware.

24          THE COURT:  Except -- hang on.  The cases first of all

25   don't say that each factor gets equal weight, but the purpose,

581kima

1    according to the Supreme Court, of 1404(a) "is to prevent the

2    waste of time energy and money and to protect litigants,

3    witnesses and the public against unnecessary inconvenience and

4    expense."  That is the core purpose.

5         It seems to me that that statement applies most

6    emphatically to a situation where you have seven complex

7    lawsuits in another jurisdiction that happens to be the home

8    jurisdiction where the locus of facts operatively take place.

9    The lead plaintiff says it ought to be done there.  If not this

10   case, then what case would be transferred under that set of

11   circumstances?

12        MR. TRINKO:  But, your Honor, this has been general,

13   generic information that has been in support of this motion to

14   transfer, and, as you know, the courts say there has to be a

15   clearcut showing that the proposed transfer is in the best

16   interests of litigation and that there is a clear and

17   convincing showing that it serves the purposes of convenience

18   and justice.  The mere fact that the company is headquartered

19   in Delaware, that is only a factor.

20        THE COURT:  I agree, and that is the Geopharma case.

21   The Geopharma case is not this case.  It is not even a question

22   of bowing to the plaintiffs' choice of forum.  The whole idea

23   behind lead plaintiff is that they are supposed to lead the

24   plaintiffs, and the lead plaintiff says I want to go to

25   Delaware.  If I defer to the plaintiffs' choice of forum, the

581kima

1   lead plaintiff wants to go to Delaware.  We could have 20 other

2   plaintiffs saying I want to go to New Hampshire and I want to

3   go to Minnesota.

4        MR. TRINKO:  But lead plaintiff did not file an action

5   here.  We filed an action here.  I understand they are very

6   experienced and esteemed counsel and they filed in Delaware.

7        THE COURT:  Experienced counsel, who presumably

8   understand and I even asked him, about the pitfalls of going to

9   Delaware, and he doesn't seem the least troubled.  I don't

10  think that plaintiffs' counsel willy-nilly gets on the same

11  page with defense counsel.  It is a rather unusual situation.

12       MR. TRINKO:  Yes, that is true.

13       THE COURT:  To me it is an overriding factor.  There

14  are going to be a lot of difficult issues, and the idea that

15  you are going to have two different jurisdictions addressing

16  the issues just doesn't make sense.

17       MR. TRINKO:  There is always the option for the

18  Delaware cases to come here.

19       THE COURT:  But nobody wants that.  They are happy to

20  be in Delaware.  In theory that may be, but it reality it is

21  not.  Again, you are dealt here with the hand you've got, and

22  it seems to me that it doesn't make sense to keep it here.

23       MR. TRINKO:  Your Honor, I respectfully disagree.

24       THE COURT:  Please.

25       MR. TRINKO:  And I feel that in terms of the focus of

581kima

1  proof as I see it is on New York and the New York witnesses,

2  and we have laid that out, neither the defendants nor Milberg

3  Weiss has made a submission to this court in support of their

4  motion to transfer to Delaware, as to what witnesses are

5  inconvenienced by the continuance of the case here and what

6  documents and whatever are available to the court here.

7         THE COURT:  I agree with you, they haven't done that,

8  put their eggs in the basket of efficiency in the last factor,

9  and so certainly if you add up all the factors, that is not

10 going to count heavily in their favor.  You do have in their

11 favor that the party witnesses are in Delaware.  They haven't

12 given me a single nonparty witness -- you have given me some,

13 but you haven't given me reason to believe that they won't

14 testify.  Either they will come down or they will do it by

15 videotaped deposition.

16        So I don't know that there is an inconvenience to the

17 nonparty witnesses, to the extent their testimony can be done

18 by deposition or videotape.  So what is the inconvenience to

19 the nonparty witnesses?

20        MR. TRINKO:  There is no inconvenience to their

21 parties either.

22        THE COURT:  So it is a neutral factor, and you go down

23 the other factors, and I am not sure which cut in your favor,

24 compared to the one that does cut substantially in their favor,

25 which is the efficient and fair administration of justice from

581kima

1    the fact that there are all the other actions do you know in

2    Delaware.  Tell me what factor remains to sway in your favor.

3                MR. TRINKO:  One is that one of the plaintiffs is from

4    New York and filed here.  That is a factor.

5                THE COURT:  It is a factor but it doesn't weigh very

6    much here because in this lawsuit, your plaintiff's testimony

7    is certainly not critical at all to the case and it is mildly

8    inconvenient because we are talking Delaware here.  It is

9    certainly balanced by the defendant individually and the

10   parties as well.  So that seems to be a wash.  What factor

11   remains in your favor?

12                MR. TRINKO:  If you look at the locus of the true

13   facts -- I don't think that one needs to spend that much time

14   on the background of MBNA documents and witnesses to ascertain

15   that their statements were false.

16                THE COURT:  I couldn't disagree with you more.  It

17   seems, and the cases all say that, their conduct is what is

18   case is all about.  You have to show that they intended to

19   defraud the investors when they made the statements.

20                MR. TRINKO:  I think the fact that they told $76

21   million worth of stock and got these bonuses, I think those are

22   clear factors that tend to show that.

23                THE COURT:  They will require a great deal of

24   discovery, I have no doubt.

25                Anything else you would like to add?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

581kima

 1          MR. TRINKO:  No, your Honor.  I think that you have

 2    covered the remaining points and that we talked about it.  I

 3    still would say that both the defendant and Milberg Weiss have

 4    not really made a showing other than some generic statements

 5    about the fact that the corporation and some of the witnesses

 6    are located there and that is the preeminent rationale for

 7    going to Delaware.  I am saying there are other factors that

 8    should be taken into account and I would still argue for the

 9    continuance of the litigation in New York.

10          THE COURT:  Thank you, Mr. Trinko  Anything else,

11    Mr. Pepperman?

12          MR. PEPPERMAN:  No, your Honor.

13          THE COURT:  Mr. Rado, anything else?

14          MR. RADO:  No, your Honor.

15          THE COURT:  Mr. Trinko, you have done yeoman's work

16    with a pair of deuces here.  I mean that.  I thought you did a

17    terrific job in your submission and of course in argument, but

18    I am going to grant the motion and state my reasons on the

19    record because I don't want to hold up the case.

20          Just some background.  In two related class actions,

21    plaintiffs Virginia McMath and Scott Kimball bring suit of

22    behalf of all purchasers of MBNA securities between January 20,

23    2005 and April 21, 2005, which is the class period, under

24    sections 10(b) and 20(a) of the Securities Exchange Act of

25    1934, as well as Rule 10b-5 promulgated thereunder against MBNA

581kima

1    Corp. and certain of its officers and directors.

2            The defendants have moved to consolidate the McMath

3    and Kimball actions pursuant to Federal Rule of Civil Procedure

4    42(a) and to transfer the consolidated action to the District

5    of Delaware pursuant to 28 USC 1404(a).  For the reasons I will

6    discuss herein, the defendants' motions, both of them, are

7    granted.

8            Some background facts.  Scott Kimball and Virginia

9    McMath allegedly purchased, respectively 2,000 and 400 shares

10   of publicly traded MBNA securities in April 2005, during the

11   class period.  Kimball resides in New Hampshire and McMath

12   resides in White Plains, New York.  MBNA is a bank holding

13   company incorporated in Maryland and headquartered in

14   Wilmington, Delaware, with more than 1.277 billion shares of

15   common stock on the New York Stock Exchange.  MBNA maintains

16   one of its six regional offices in this district.  The

17   individual defendants are high-ranking officers and directors

18   of MBNA that include, for example, its CEO, CFO, and former

19   COO.  Defendants have represented that they reside in Delaware

20   and work at the corporate headquarters.

21           The complaints allege against all defendants

22   violations of 10(b), Rule 10b-5 and 20(a), in connection with

23   statements made in a press release issued on January 20, 2005,

24   during an earnings conference call held on January 21, 2005,

25   and at an investor conference on January 9, 2005.  The

581kima

1    conference call was allegedly held by members of MBNA's

2    executive committee, including some of the individually named

3    defendants, who gave "earnings guidance" to attendants,

4    including analysts located in New York and elsewhere.  It is

5    alleged that two of the individually named defendants,

6    Vecchione and Rhodes, also spoke at the investors conference,

7    which was held in Orlando, Florida, and was attended by many of

8    the same New York analysts, among others.

9           Plaintiffs' primary claim is that in these three

10   instances, defendants falsely promised "consistent, profitable

11   growth" during 2005 at a time when MBNA's competitors were

12   lowering their guidance because of decreasing credit card

13   revenues and increasing advertising expenses.  Plaintiffs

14   allege that the dissemination of defendants' false statements

15   caused MBNA's stock to trade at inflated rates until

16   defendant's announcement on April 21, 2005, that MBNA's first

17   quarter earnings were only 2 cents per share, a 93 percent

18   decline from the 59 cents per share allegedly reported in the

19   first quarter of 2004.  This announcement resulted in an

20   immediate drop of MBNA's stock price from $23.11 to below $19

21   per share on unusually high trading volume.  This is all

22   discussed in the complaint, between paragraphs 3 and 5.

23          Before the deflation of MBNA's stock values, however,

24   the individual defendants allegedly were able to sell millions

25   of dollars of their own shares at the inflated prices and pay

581kima

1    themselves substantial bonuses keyed to MBNA's falsely reported

2    performance.  That is from paragraph 4.  The complaints seek

3    monetary compensation for Kimball, McMath, and the other class

4    members.

5          In terms of the procedural history, which is quite

6    relevant to this motion, shortly after the precipitous decline

7    of MBNA's stock on April 22, 2005, a handful of class actions

8    were filed in the District of Delaware.  The first, Baker v.

9    MBNA Corp., 05 Civ. 272 was filed on May 5,2005, and followed

10   by seven additional lawsuits.  The Kimball action was initiated

11   in this district on May 16, 2005, followed thereafter by the

12   filing of the McMath action on May 31, 2005.

13         In July 2005, the Kimball and McMath plaintiffs

14   together moved to consolidate the two actions presently before

15   this court and to be appointed lead plaintiffs.  On July 22,

16   Kimball and McMath withdrew their motion for appointment as

17   lead plaintiffs.

18         Ultimately, Activest Investmentgesellschaft mbH for

19   account of the PT-Master fund and Enerfonds, and I will refer

20   to this as Activest, made an unopposed motion for appointment

21   as lead plaintiff and selection of Milberg Weiss as lead

22   counsel.

23         At a conference before this court on July 27, 2005,

24   both the consolidation and official appointment of lead

25   plaintiff were held over and defendants were granted leave to

581kima

1   file their motion to transfer.  The court notes that Activest,

2   the unopposed movant for lead plaintiff, does not oppose

3   defendants' transfer motion.  In fact, in a letter dated August

4   1, 2005, counsel for Activest writes, and I quote:  "We write

5   to reiterate our position that the cases belong in Delaware,

6   which is where the company is headquartered and the witnesses

7   and documents are most likely to be found."  Only plaintiffs

8   Kimball and McMath oppose the present transfer motion.

9        Before proceeding with its consideration of the

10  transfer motion, however, the court finds it appropriate to

11  grant defendants' unopposed motion to consolidate the Kimball

12  and McMath actions, which are essentially identical securities

13  actions pertaining to the same class period and based on the

14  same alleged misstatements and legal authority.

15       In terms of section 1404(a), this section permits the

16  transfer of any civil action to any other district court where

17  the case might have brought so long as the transfer serves "the

18  convenience of parties and witnesses and is in the interests of

19  justice."  28 USC 1440(a).  "This section is a statutory

20  recognition of the common law doctrine of forum non conveniens

21  as a facet of venue in the federal courts."  So said the court

22  in Wilshire Credit Corp. v. Barrett Capital Management Corp.,

23  976 F. Supp. 174, page 180, a Western District of New York

24  case.  The purpose of 1404(a) is to "prevent the waste of time,

25  energy and money, and to protect litigants, witnesses and the

581kima

1    public against unnecessary inconvenience and expense." This is

2    from the Supreme Court's decision in Van Dusen v. Barrack, 376

3    US 612, 616.  It is a 1964 case.  As such, the core

4    determination under section 1404(a) is the center of gravity of

5    the litigation.

6         "Section 1404(a) is intended to place discretion in

7    the district court to adjudicate motions for transfer according

8    to an individualized, case-by-case consideration of convenience

9    and fairness."  Supreme Court decision in Stewart Org. Inc. v.

10   Ricoh Corporation, 487 US 22, at page 29, a 1988 decision

11   quoting Van Dusen at page 622.  "The burden of demonstrating

12   the desirability of transfer lies with the moving party, and in

13   considering the motion for transfer a court should not disturb

14   a plaintiff's choice of forum unless the defendants make a

15   clear and convincing showing that the balance of convenience

16   favors the defendants' choice.  The defendant moving for a

17   transfer must, therefore, demonstrate that transfer is in the

18   best interests of the litigation."  This is from a case called

19   Linzer v. EMI Blackwood Music Inc., 904 F. Supp. 207, at page

20   216, Southern District of New York 1995.

21        In determining whether transfer is appropriate, the

22   court may consider the following factors: (a) the convenience

23   of witnesses; (b) the convenience of the parties; (c) the locus

24   of operative facts; (d) the location of relevant documents and

25   relative ease of access to sources of proof; (e) the

581kima

1    availability of process to compel the attendance of unwilling

2    witnesses; (f) the forum's familiarity with the governing law;

3    (g) the relative financial means of the parties; (h) the weight

4    afforded plaintiff's choice of forum; and (i) trial efficiency

5    and the interests of justice.

6           The threshold consideration in a transfer motion is

7    whether venue is proper in the proposed transferee district.

8    In this case, venue is governed by section 27 of the 1934 Act,

9    which provides that venue is proper in any district in which

10   "an act or transaction constituting the violation occurred," or

11   "where the defendant is found or is an inhabitant or transacts

12   business."  Here there is no dispute that venue is proper in

13   the District of Delaware, which is home to the corporate

14   defendant and the individual defendants, and where many of the

15   allegedly false statements originated.

16          In terms of balancing each of the above factors,

17   beginning with the convenience of parties and witnesses, it is

18   accepted that the convenience of witnesses is generally

19   considered one of the most important factors in deciding a

20   venue transfer motion.  It is a matter of the materiality,

21   nature and quality of each witness, not merely the number of

22   witnesses in each district.  Greater weight is given to the

23   convenience of nonparty witnesses than party witnesses, and

24   little weight is given to the convenience of witnesses outside

25   both the transferrer and transferee districts.

581kima

1       It is well established in this district that the

2   moving party must identify specific witnesses who would be

3   inconvenienced by litigating the action in the present forum

4   and provide a general statement of their proposed testimony.

5   In this case, defendants have not specifically identified the

6   testimony of witnesses who would be inconvenienced by this

7   action remaining in New York, and the absence of such an

8   affidavit is both notable and disappointing in this

9   circumstance.  Nevertheless, it cannot be disputed that the

10  individual defendants and other MBNA employees will be the

11  critical witnesses in this case.  And, as "the facts giving

12  rise to this action lie within the knowledge of the officers

13  and employees of [MBNA] who participated in creating and

14  disseminating the allegedly false and misleading statements,"

15  the individual defendants will undoubtedly be giving

16  significant testimony and participating in extensive discovery

17  associated with the seven pending Delaware actions.  The quote

18  was from a case called Lewis, reported at 2003 WestLaw 1900859,

19  at star 3.

20      Although it cannot be truly said, in view of the

21  nature of MBNA's business, that MBNA's officers and directors

22  would be significantly inconvenienced by travel from New York

23  to Delaware or Delaware to New York, travel back and forth

24  between the two forums for purposes of defending related class

25  actions is plainly burdensome.  Defendants gain a substantial

581kima

1    measure of convenience in being able to defend against all of

2    the related actions in a single forum.  This, from among

3    others, is noted in Goggins, 279 F. Supp.2d at page 233.

4           For their part, plaintiffs argue, for example, that

5    the 17 New York analysts who issued reports and recommendations

6    in reliance on defendants' allegedly false statements make up

7    an important block of objective, nonparty witnesses who would

8    be inconvenienced by transfer of this action to Delaware.

9    Indeed, in In Re Geopharma Inc., 2005 WestLaw 1123883, at star

10   2, a May 11 decision of this year, the defendants in support of

11   their transfer motion argued, as the defendants do here, that

12   the key testimony would come from defendants' officers and

13   employees who were responsible for drafting and distributing

14   the allegedly misleading statements.  Judge Scheindlin

15   concluded, however, that "while convenience of witnesses is an

16   important factor that must be weighed in determining the proper

17   venue, convenience of defendants' party witnesses cannot

18   operate to eliminate section 27's explicit provision for

19   jurisdiction wherever any violation occurred."  Noting a host

20   of nonparty witnesses located in New York and elsewhere,

21   including New York analysts and securities commentators, Judge

22   Scheindlin found that this factor was neutral.

23          The Geopharma opinion does not, however, discuss the

24   anticipated relevance of the analyst testimony or, for that

25   matter, the testimony of any of the other potential nonparty

581kima

1    witnesses who would be inconvenienced by a transfer.  In this

2    regard, because New York is home to the country's largest stock

3    exchange, every major investment bank, and the vast number of

4    analysts, too great an emphasis on analyst testimony, as

5    opposed to officer testimony, has its own negative implications

6    for jurisdiction in securities fraud actions.

7            Moreover, and more important to this analysis, as we

8    discuss in greater detail below, this case is easily

9    distinguished from Geopharma by virtue of the seven related

10   actions in Delaware and the represented willingness of lead

11   plaintiffs' counsel to litigate this case in Delaware.  Indeed,

12   one of the things that makes this case different is that the

13   plaintiff opposing transfer in Geopharma had just been

14   appointed lead counsel, something which is not true here.

15   Thus, whatever may be said of the significance of analyst

16   testimony, it is obviously the judgment of the unopposed lead

17   plaintiffs' counsel that plaintiffs' case will proceed and be

18   unaffected by the potential analyst testimony in New York.

19           Moreover, as has been discussed during oral argument,

20   there is unlikely to be a great amount of inconvenience to

21   either side, including the conversations, for the very real

22   possibility that videotaped deposition testimony will be used

23   in this case.

24           Accordingly, the court concludes that the testimony of

25   the 17 New York analysts is relevant but not critical, and, in

581kima

1    any event, not of the kind that would suffer from the use of

2    alternatives to live testimony, such as testimony by video

3    conferencing or deposition.

4            Finally I note that the personal inconvenience to

5    plaintiffs is slight.  As previously noted, any participation

6    by plaintiffs or their representatives in any hearing or trial

7    would be minimal given that the focus of this action is the

8    intent and conduct of the defendants in Delaware.  Among other

9    cases, this was noted in Adair, reported at 2000 WestLaw

10   1716340, at star 2.  Thus, the convenience of the parties and

11   witnesses, if it weighs in any favor, weighs slightly in favor

12   of transfer, but is in reality probably neutral.

13           The next factor is locus of operative facts.  Where

14   the operative facts occurred is a primary factor to consider.

15   This was noted by Judge Sweet in Goggins, 279 F. Supp.2d, at

16   page 233.  More to the point, "where the operative facts are

17   concentrated in a specific district other than the district in

18   which plaintiff has sued, the action should be transferred to

19   that district notwithstanding plaintiff's choice of forum."

20   This is from Lewis, 2003 WestLaw 1900859, at page star 3.

21   Indeed, "courts routinely transfer cases when the principal

22   events occurred and the principal witnesses are located in

23   another district."  That is from Nemaron Corp., 30 F. Supp.2d,

24   at page 404.

25           Here, virtually all the critical events or statements

581kima

1    occurred or originated, allegedly, in Delaware.  MBNA's press

2    releases and the predictions underlying those releases were

3    generated or, at the very least, reviewed by certain individual

4    defendants who worked at MBNA's headquarters in Wilmington.

5         Indeed, the complaint itself alleges that "many of the

6    internal reports showing MBNA's forecasted and actual growth

7    were prepared by the finance department under Vecchione's

8    direction.  Defendant Hammonds as CEO, president and director

9    of MBNA and the other officer defendants named herein were

10   responsible for the financial results and press releases issued

11   by the company," and that is from paragraph 20.  Similarly, the

12   statements during the conference call were made by individual

13   defendants who worked in Delaware.

14        The Southern District's most significant contact with

15   the operative facts of this case is the dissemination of these

16   allegedly misleading statements to, among others, security

17   analysts in New York.  Yet it is settled that

18   "misrepresentations and omissions are deemed to occur in the

19   district where they are transmitted or withheld, not where they

20   are received."  This is from Purcell Graham Inc. v. National

21   Bank of Detroit, 1994 WestLaw 584550 at star 4, October 24,

22   1994, Southern District case.

23        In cases such as Goggins and Berman, courts in this

24   district have routinely found the locus of operative facts to

25   be the forum where the allegedly fraudulent statements

581kima

1   originated.  Thus this factor weighs in favor of transfer, as

2   there is nothing about the allegations in this complaint that

3   suggest anything other than the locus of operative facts

4   primarily reside in Delaware.

5          Next is the location of relevant documents.  The

6   location of relevant documents and ease of access to sources of

7   proof is "clearly an important consideration in motions to

8   transfer."  This is from Aquatic Amusement Association Ltd. v.

9   Walt Disney World Co., 734 F. Supp. 54 at page 58, a Northern

10  District of New York case from 1990.  Here, although it is

11  likely that the significant quantum of relevant documents is

12  located in Delaware at MBNA's corporate headquarters,

13  defendants have made no specific showing of any particular

14  burden that transferring the documents would entail.  Nor has

15  plaintiff made such a showing.  Accordingly, this factor, if it

16  weighs towards either side, weighs only marginally in favor of

17  the transfer to the District of Delaware and at best is neutral

18  for plaintiffs.

19         The next is availability of process.  Almost without

20  exception, the defendants' proposed witnesses are current

21  officers of and former employees of MBNA.  The former category

22  obviously remain in MBNA's control.  Thus, this factor does not

23  weigh in favor of transfer at least as to the current

24  employees.  In any event, however, there has been no suggestion

25  that the unavailability of process in this district would pose

581kima

1    a problem for defendants.

2           Plaintiffs, on the other hand, propose among other

3    categories of unavailable nonparty witnesses the New York

4    analysts as well as outside auditors and counsel who presumably

5    would be outside the subpoena power of the transferee forum.

6    But there has been no indication that these witnesses would

7    refuse to testify in Delaware if asked.  Nonetheless, if

8    plaintiffs plan to make their case based on, among other

9    things, the conduct and testimony of analysts, and the

10   complaint suggests that this was part of their theory prior to

11   the filing of this motion, then they may be exposed to the

12   possibility of some inconvenience by the unavailability of

13   process over New York analysts.  But, as I noted earlier, the

14   availability of alternatives substantially diminishes

15   plaintiffs' claim in that regard, so I find at best this factor

16   weighs modestly against transfer but it does weigh to some

17   extent against transfer.

18          The next factor is the forum's familiarity with

19   securities law.  As this court and the District of Delaware are

20   equally capable of applying federal securities law, this factor

21   is neutral.

22          Next is the parties' relative financial means.  This

23   factor similarly is neutral.  Neither party asserts that it

24   does not have the means to litigate this case in one or the

25   other forum.

581kima

1        Next factor is the weight afforded plaintiffs' choice

2   of forum. "A plaintiff's choice of forum generally is entitled

3   to considerable weight and should not be disturbed unless the

4   balance of factors weighs strongly in favor of defendant."

5   This is from Adair, 2000 WestLaw 1716340, at page star 3.

6   Thus, equally balanced factors favor plaintiffs' choice of

7   forum.

8        When the chosen forum is the plaintiffs' resident

9   forum and/or has significant connections to the operative facts

10  of the case, the plaintiffs' choice is entitled to even greater

11  deference. However, "where there is little material connection

12  between the case and the chosen forum, a plaintiff's choice of

13  forum carries less weight." This is from Stillwater Mining,

14  2003 WestLaw 21087953, at page star 5.

15       In the class action context, moreover, it is well

16  settled that "less weight is given to the plaintiffs' choice,"

17  and this is from the Goggins case, 279 F. Supp.2d at page 232,

18  because "there will be numerous potential plaintiffs each

19  possibly able to make a showing that a particular forum is best

20  suited for the adjudications of the case's claim," also from

21  Goggins.

22       As plaintiffs note, however, the parties seeking

23  transfer of a class action must nevertheless make the required

24  "convincing showing that the action would be better litigated

25  elsewhere." In this case, plaintiffs' choice of forum bears

581kima

1    little connection to the operative facts of this case.

2              In addition to McMath's New York residence, plaintiffs

3    argue that the following constitute connections to this

4    district:  The location of MBNA's regional office in Manhattan,

5    the trading of MBNA stock on the New York Stock Exchange, the

6    presence of analysts in this district who cover MBNA, and

7    MBNA's business contacts with New York investment firms.

8    However, in the context of a securities fraud action, these are

9    not material connections with the forum.

10             Moreover, McMath's New York residence and her choice

11   of forum are entitled to less deference, not just because she

12   is one of many class members but because McMath and Kimball

13   have withdrawn their motion for appointment as lead plaintiff,

14   and the unopposed movant for lead plaintiff, Activest, concedes

15   and expresses his desire that Delaware be the forum for

16   adjudication.  Under these circumstances, Kimball and McMath's

17   choice of forum carries little weight.

18             In reaching this decision, I recognize the discussion

19   in Geopharma as well as Lemberger about the interplay between

20   the venue provision 1404(a) and the venue provision of the 1934

21   Act, and while an interesting discussion can be had there as to

22   how to resolve that tension, I don't think it needs to be done

23   in this case because of the next factor, which is trial

24   efficiency and the interests of justice.

25             It really is this factor that weighs very, very

581kima

1   heavily in favor of transfer.  Therefore, I think it allows

2   defendants to say that they have met their burden to show that

3   transfer is appropriate both clearly and convincingly.

4   Delaware is the center of gravity of this litigation.  It is

5   where the corporate defendant is headquartered.  It is where

6   the individual defendants work and it has been represented they

7   reside.  It is where the allegedly misleading statements that

8   form the foundation of plaintiffs' actions originated.  If

9   these circumstances left any doubt, the seven related actions

10  pending in the transferee district seal the deal.  "Transfer of

11  an action to a district where a related case is pending enables

12  more efficient conduct of pretrial discovery, saves witnesses

13  time and money in both trial and pretrial proceedings, thereby

14  eliminating unnecessary expense to the parties while at the

15  same time serving the public interest."  This is from MK

16  Systems Inc. v. Schmidt, 04 Civ. 8106, 2005 WestLaw 590665, at

17  page star 6, a Southern District of New York case.  Indeed, the

18  Second Circuit has long recognized the "strong policy favoring

19  the litigation of related claims in the same tribunal in order

20  that pretrial discovery can be conducted more efficiently,

21  duplicitous litigation can be avoided, thereby saving time and

22  expense for both parties and witnesses."  This is from Wyndham

23  Associates v. Bintliff, 398 F.2d 614 at page 619.  It is a 1968

24  case.

25        Plaintiffs' claims in this district in their

581kima

1   complaints are almost identical to those made against

2   defendants in the District of Delaware.  Plaintiffs indeed do

3   not dispute that the majority of the actions focus on the same

4   three instances of false or misleading statements, the press

5   releases, and the conference, that form the basis of

6   plaintiffs' allegations here.  The class periods in the New

7   York and the Delaware actions overlap significantly, and all

8   nine actions allege stocks sales by the individual defendants

9   as proof of scienter.  Although the Delaware actions have yet

10  to be consolidated, there is every reason to believe that they

11  will be consolidated in due course.  Moreover, contrary to

12  plaintiffs' assertion, the earlier stage of the Delaware

13  litigation weighs in favor of transfer rather than against.

14  For example, this was the finding of the court's decision in

15  Micromusing v. Aprisma Management Technologies Inc., 2005

16  WestLaw 1241924, at page star 4, where the court therein found

17  decreased judicial economy in transfer where related action in

18  transferee forum had been pending for two years and discovery

19  was closed.  So it is a cite by way of analogy.

20        Indeed, the fact that both the Delaware and the New

21  York actions are under nascent stages means there is even less

22  to be lost and more to be gained by transferring the present

23  actions to Delaware so they may be in step with the Delaware

24  actions from the get-go.  As Judge Pauley explained in

25  MasterCard International v. Lexcel Solutions Inc., 2004 WestLaw

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

581kima

1    1368299, at page star 2, "it would be inefficient and a waste

2    of judicial resources to subject the same parties to suit over

3    interconnected claims in two separate fora.  The witnesses who

4    may testify in this action are identical to the witnesses

5    identified in the pending litigation in the transferee forum.

6    To compel such witnesses to travel to a second forum to give

7    similar testimony on the same dispute would be burdensome and

8    inefficient for the parties and would not promote judicial

9    efficiency."  Thus, as I said, this factor strongly favors

10   transfer of these cases to Delaware.

11        Thus, in sum, even if the promotion of judicial

12   efficiency did not outweigh all the factors of this case, there

13   are other factors that tip the scales towards transfer, and

14   while there is one that argues slightly against transfer and

15   the rest are neutral, the overwhelming balance of these factors

16   leads me to conclude that the defendants have met their burden

17   of clearly and convincingly persuading this court that the

18   balance of convenience and justice weighs clearly in favor of

19   transferring this case to the District of Delaware.

20        So, as I said, the motion to consolidate the two

21   actions is granted and it is further ordered that the

22   defendants' motion to transfer the actions to the District of

23   Delaware is granted and the Clerk of the Court is directed to

24   transfer the cases forthwith to the District of Delaware.

25        As I said at the outset of giving my reasons, Mr.